Soufiane **BENDAOUD, individually and on behalf of others similarly situated, Plaintiff,**

v.

John C. **HODGSON, et al., Defendants.**

Civil Action No. 06cv11873–NG.

United States District Court, D. Massachusetts.

Sept. 24, 2008.

Adam M. Stewart, Thomas G. Shapiro, Shapiro Haber & Urmy LLP, Boston, MA, Stephen J. Fearon, Jr., Squitieri & Fearon, LLP, Thomas J. McKenna, Friedman, Wittenstein & Hochman, New York, NY, for Plaintiff.

Charles C. Platt, Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Jeffrey B. Rudman, Michael R. Dube, Wilmer Hale LLP, Boston, MA, for Defendants.

*ORDER ON MOTIONS TO DISMISS*

GERTNER, District Judge:

## TABLE OF CONTENTS

I. *BACKGROUND* .................................................... 260
   A. *Facts* ...................................................... 260
   B. *Procedural History* ......................................... 262

II. *LEGAL STANDARD* ............................................. 262

III. *STANDING* ..................................................... 262
   A. *Standing and § 1132(a)(2) Suits* ............................ 263
   B. *Whether Bendaoud Has Alleged an Injury In Fact* ........... 268
     1. *Economic Loss to Analog Stock Fund Holdings as a Result of the Backdating* ......................................... 269
     2. *Bendaoud's Economic Loss as a Result of Investing in the Analog Stock Fund* ....................................... 271
     3. *The Fiduciaries' Unlawful Profit Through "Use Of" Plan Assets* ..... 273

IV. *WHETHER BENDAOUD HAS STATED A CLAIM UPON WHICH RELIEF CAN BE GRANTED* .............................. 274
   A. *Which Defendants Are Amenable to Suit as ERISA Fiduciaries* ..... 274
   B. *Whether the Defendants' Acts Were Those of ERISA Fiduciaries* ......... 276
   C. *Whether the Plaintiff Has Sufficiently Alleged a Material Misrepresentation* ....................................... 278
   D. *Whether the Relief Plaintiff Seeks Is Available* ............. 279

V. *THE RELEASE* ................................................. 279

VI. *CONCLUSION* .................................................. 280

This case centers on allegations that certain officers at Analog Devices, Inc. ("ADI") abused their positions of trust as fiduciaries under the Employee Retirement Income Security Act of 1974 ("ERISA").[1] The plaintiff, Soufiane Bendaoud ("Bendaoud" or "plaintiff"), is a former employee of ADI. While an employee, he participated in ADI's benefit plan, the Investment Partnership ("the Plan"). The Plan is a defined contribution plan regulated, in part, by ERISA. This case concerns a single investment option available to Plan participants—the Analog Devices Stock Fund ("the Analog Stock Fund"), which bought and held shares of ADI common stock. Bendaoud invested in the Analog Stock Fund.

According to Bendaoud, certain officers at ADI unlawfully backdated stock options they had received as compensation. Information regarding the improper practice was withheld from Plan participants, as well as the stock market as a whole. When information regarding the improper practices came to light, due to an investigation by the Securities and Exchange Commission, the value of ADI stock declined precipitously, harming the interests of Plan participants who had invested in the Analog Stock Fund.

Before the Court are two Motions to Dismiss—one for want of standing and the other for failure to state a claim. The first, the defendants' Motion to Dismiss for Lack of Jurisdiction (document # 7), contends that Bendaoud has not suffered an injury in fact. That Motion is **DENIED.** While not all of Bendaoud's claims present a legally cognizable harm, he has alleged that the Analog Stock Fund was an imprudent investment option and that

the defendants improperly withheld from him material information affecting its value and predicting its future performance. Each of those allegations arguably states a claim for breach of fiduciary duty under ERISA, regardless of whether Bendaoud can actually prove that he lost a specific amount of money in connection with his sale of ADI stock offered in the Analog Stock Fund.

The second motion, the defendants' Motion for Dismissal Pursuant to Rule 12(b)(6) (document # 8), is **GRANTED in part and DENIED in part.** The defendants are correct that setting and receiving executive compensation is the act of a corporate officer, not an ERISA fiduciary. But the two cognizable harms Bendaoud alleges, maintenance of an imprudent investment option and withholding of information regarding the backdating practice, are the acts of ERISA fiduciaries.

The final issue presented by the defendants on their Motions to Dismiss, whether Bendaoud has released his claims against ADI, is not appropriate for resolution at this time, on this record. The Court will order an abbreviated discovery schedule to address the issues the release presents.

## I. BACKGROUND

### A. Facts

On a motion to dismiss, the Court accepts all of the plaintiff's well-pleaded facts as true and draws from them all reasonable inferences in the plaintiff's favor. See, e.g., Clark v. Boscher, 514 F.3d 107, 112 (1st Cir.2008). In this case, the defendants have averred additional facts by affidavit, and the plaintiff has not disputed them; the Court accepts them where they

---

**1.** For most purposes, ADI and the named individual defendants are similarly situated with respect to the instant motions. Except

where necessary, the Court refers to them collectively as "the defendants."

do not conflict with the plaintiff's Complaint.

ADI maintained the Plan at all times material to this case, from October 2000 forward. Since the Plan is a defined contribution plan, *see* Compl. ¶ 42 (document # 1), participants have the option of directing their investments toward any of several investment options sponsored by the Plan. One such option was the Analog Stock Fund. The Analog Stock Fund purchases exclusively ADI stock on the open market, and investors in the Fund own a portion of all of the Fund's holdings. Granato Aff. ¶ 7 (document # 15).[2]

Bendaoud invested in the Analog Stock Fund for the first time in July 2000, when the price of a share of ADI stock was approximately $71.00. Over the next two and a half years, he made several transactions involving the Analog Stock Fund, eventually cashing out of it entirely in December 2002, when the price of a share of ADI common stock was approximately $30.00. *See id.* ¶¶ 9, 31. Despite that decline, it is not disputed that Bendaoud made a modest profit on his investments in the Analog Stock Fund. *See id.* ¶¶ 19, 29, 30.

In choosing to invest in the Analog Stock Fund, Bendaoud relied on the information in the Plan and on various documents incorporated into the Plan by reference—including a number of filings made with the Securities and Exchange Commission ("SEC"). *See* The Investment Partnership Prospectus ("Prospectus") at 15–

16, Bates ADI 000234–235, Ex. A to Dube Aff. Supp. Def. Mot. Dismiss Pursuant to Rule 12(b)(6) ("Dube 12(b)(6) Aff.") (document # 13);[3] *see also* Compl. ¶ 42 (document # 1) (citing 11–K filing). Several incorporated documents discussed the manner in which certain ADI employees and directors could receive and exercise stock options. Compl. ¶¶ 53–71 (document # 1). Notably, those documents required that the exercise price of the options be set at the fair market value of ADI's common stock on the day the option was granted. *Id.* ¶¶ 64, 66–71.

But according to Bendaoud, that practice was not followed. Instead, despite the public statements to the contrary, various directors and executives at ADI systematically backdated their stock options to fix a lower purchase price for ADI stock. *See id.* ¶¶ 72–78. The practice remained secret until November 2004, when ADI disclosed that the SEC was investigating its options practices for the preceding five years. ADI did not admit, however, that any backdating actually occurred. *Id.* ¶¶ 79–81.

About a year later, ADI reached a tentative settlement with the SEC, and admitted in a press release that it should have disclosed to the public that certain stock options had been inappropriately dated for the day before favorable financial results were released. *See id.* ¶ 82. Officially, the settlement also meant that ADI neither admitted nor denied the SEC's charges. *Id.*[4]

---

**2.** The relationship between the price of a share of ADI stock and the price of a unit of the Analog Stock Fund is not entirely clear.

**3.** The Prospectus is dated January 1, 2006. In the absence of a suggestion to the contrary from any party, the Court will assume that its provisions have remained materially identical since 2000.

**4.** *More recently, the SEC again charged Analog and defendant Fishman with reporting false compensation information by backdating stock options. Analog and Fishman settled the claims for some $4 million, and Fishman was ordered to pay an additional $450,000.00 in disgorgement. SEC Litigation Release No. 20604, SEC v. Analog Devices, Inc., No. 08-cv-00920 (D.D.C. filed May 30, 2008), Ex. B*

Following the disclosure of the improper option practice in November 2004, the value of ADI stock "plummeted." *Id.* ¶ 9.[5] According to Bendaoud, the improper options practice hurt the value of ADI stock, thereby diminishing the value of his and others' holdings. *See id.* ¶ 122. He further claims that the defendants acted imprudently in allowing him to invest in the ADI fund because they knew or should have known that its value was not what it seemed, and because the company's executive compensation practices were not what they represented. *See, e.g., id.* ¶ 144; Pl. Mem. Opp. Mot. Dismiss Pursuant to Rule 12(b)(6) ("Pl.12(b)(6) Mem.") at 16 (document # 31).

### B. *Procedural History*

As noted above, the defendants have asserted two separate arguments underlying its claims that the case must be dismissed. The Court held a hearing on the Motions, and took them under advisement. It has since twice requested supplemental briefing from the parties regarding whether the suit could redress Bendaoud's alleged injury. *See* Electronic Order (Feb. 14, 2008); Second Mem. & Order Requesting Suppl. Br. (Mar. 20, 2008) (document # 52). The parties have responded.

### II. *LEGAL STANDARD*

On a motion to dismiss, the factual allegations of the complaint are taken as true and the reviewing court draws all reasonable inferences in the plaintiff's favor. *Trans–Spec Truck Serv., Inc. v. Caterpillar, Inc.,* 524 F.3d 315, 320 (1st Cir.2008).

The complaint must state facts that demonstrate a "claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)) (internal quotation marks omitted).

Similarly, well-pleaded facts in the Complaint are taken as true for purposes of evaluating the court's jurisdiction. *E.g., Johansen v. United States,* 506 F.3d 65, 68 (1st Cir.2007). Despite the fact that it is the defendants' motion, the plaintiff bears the burden of establishing jurisdiction. *Id.*

### III. *STANDING*

The defendants' first asserted ground for dismissal is that Bendaoud lacks constitutional standing to bring the suit. Broadly speaking, constitutional standing is an accretion of doctrines that together ensure that the litigants are the proper parties to have the court decide the issues. *See Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The Supreme Court has identified three basic components of constitutional standing, each of which must be met in order for the suit to proceed. The first is that the plaintiff must suffer a concrete, particularized, and actual or imminent injury. *See, e.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The second is that the plaintiff's harm must be fairly traceable to the defendant's alleged conduct. *Id.* Finally, it must be likely that the plaintiff's harm will be redressed by a favorable judicial decision. *Id.* at 561, 112 S.Ct. 2130. If any of

---

to Pl.'s Notice Suppl. Authority (document # 57).

**5.** The defendants sharply dispute this characterization, and have presented undisputed evidence that the ADI stock opened November 1, 2004, at $40.19 per share; closed November 30, 2004, at $36.95; closed December 31, 2004, at $36.92; and thereafter trended down to a local low price of $32.84 on April 14, 2005. *See* Historical Stock Quote for Analog Devices, Inc., Ex. D. to Dube 12(b)(6) Aff. (document # 13). The highest price the record reflects for ADI stock is $92.06 on October 5, 2000, and the lowest is $18.29 on October 9, 2002.

these should fail, there is no justiciable case or controversy.

Here, the defendants argue that Bendaoud does not meet the injury-in-fact requirement. *See* Def. Mem. Supp. Mot. Dismissal Pursuant to Rule 12(b)(1) ("Def.12(b)(1) Mem.") at 5 (document # 14). In particular, they point to the undisputed fact that Bendaoud made a profit from his investment in the Analog Stock Fund and no longer had a position in the Analog Stock Fund when the option back-dating was disclosed. *See* Granato Aff. ¶¶ 19, 31 (document # 20).

Bendaoud's response is three-fold. First, he claims that he was harmed because the value of his holding in the Analog Stock Fund did decline and because he invested in ADI rather than making another choice. Second, he notes that ERISA creates statutory rights in participants, and that the infringement of those rights can lead to the inference of a monetary loss even where the value of a participant's holdings do not decline. *See* Pl. Mem. Opp. Def. Mot. Dismissal Pursuant to Rule 12(b)(1) ("Pl.12(b)(1) Opp.") at 5–6 (document # 31). Finally, he argues that even if he did not suffer any personal injuries, the fact that he is bringing the suit "on behalf of" the entire Analog Plan is sufficient to maintain his standing. *Id.* 3; Pl. Resp. Request for Suppl. Br. ("Pl. First Suppl. Mem.") at 11 (document # 49).

The Court will address the last issue first: whether being a participant in an ERISA plan creates a cause of action for recovery to the plan as a whole, even where the individual plaintiff has suffered no damages.

**A.  *Standing and § 1132(a)(2) Suits***

It is clear that no plaintiff can simply assert the rights of a third party. The Supreme Court has repeatedly emphasized that a personal injury is in fact an "irreducible constitutional minimum." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. A plaintiff must always show the "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent." *Id.* (internal quotation, citation, and footnote omitted). And it is the plaintiff, not another, who must suffer the injury. It is irrelevant that he is a member of a group, some other members of which may have suffered an injury. *See, e.g., Warth,* 422 U.S. at 502, 95 S.Ct. 2197 (holding that named class action plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent"). Therefore, if an ERISA plan participant is to assert rights "on behalf of the plan," he must be asserting his own rights.[6]

■ The nature of those rights depends in part on whether the plaintiff is a participant in a defined benefit plan or a defined contribution plan. Clearly, the statute confers on all participants in either kind of plan the right to sue over breaches of fiduciary duty. *See* 29 U.S.C. § 1132(a)(2); *id.* § 1109; *LaRue v. DeWolff, Boberg & Assocs.,* — U.S. ——, 128 S.Ct. 1020, 169 L.Ed.2d 847 (2008) (clarifying that defined contribution plan participants may bring suit under § 1132(a)(2)). But the plaintiff is not necessarily harmed in the same manner under each type of plan. As a consequence, the standing analysis is not

---

**6.**  It is worth noting that nowhere does ERISA purport to give a participant standing to sue "on behalf of" the plan. As discussed below, the quasi-representational capacity in which ERISA participants sometimes find themselves is a judicial elaboration of the statute's requirement that relief obtained under 29 U.S.C. § 1109 inure to the plan and not to an individual plaintiff.

identical either—and the difference is crucial to this case.

A defined contribution plan is one in which an individual account (or more than one) is established for each participant. The employer makes contributions to the account, sometimes joined by the employee. *See, e.g., Register v. PNC Fin. Servs. Group, Inc.,* 477 F.3d 56, 61 (3d Cir.2007) (citing 29 U.S.C. § 1002(34) and *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 439, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999)). Frequently, as here, the employee can choose among different types of investment vehicles within the account and direct her funds accordingly. The employee is entitled to the balance of the account, and bears the risks and benefits of the investment. *Id.*

In a defined benefit plan, a participant is generally promised a fixed benefit based on a formula. He or she has no individual account, but merely expects a pension derived from the company's investments in the pension fund. That means that the participant has no individuated claim to any particular asset that belongs to the plan. *Id.* at 62; *Hughes,* 525 U.S. at 439, 119 S.Ct. 755; 29 U.S.C. § 1002(35). One could also put it another way: the participant has a small interest in every asset held by the plan, since every asset will fund the participant's pension.

For this case, the critical difference between the two types of plans is the ownership interest a participant has in the plan's assets. If a plan fiduciary breaches his duty and impairs the value of a defined benefit plan asset, then every participant in the plan is harmed according to his or her interest in the asset: that harm, though small, increases the risk that the employee's ultimate benefit will be underfunded. By contrast, if an asset in a defined contribution plan is harmed, the loss is not spread. It is visited entirely on the participant or participants who hold the impaired asset.[7]

The idea of suing "on behalf of" a plan comes from the defined benefit context. It makes little sense for a defined benefit plan participant to sue to recover the minuscule proportion of the loss that he or she bears. But ERISA creates an actionable statutory entitlement to prudent, loyal management of funds in each participant. *See* 29 U.S.C. § 1132(a)(2); *id.* § 1109. If the fiduciary is found to be in breach, he must "make good to [the] plan any losses to the plan resulting from [the] breach." § 1109(a). By allowing a plaintiff to recover the entire amount by which the asset was impaired, the statute ensures that plaintiffs can effectively protect the benefit plan without the need for a class action.

---

**7.** To borrow an analogy from Justice Breyer, *see* Transcript of Oral Argument at 39, *LaRue,* 128 S.Ct. 1020 (No. 06–856), one might compare plan assets to diamonds in a safe deposit box. Suppose there is a defined benefit plan in which 1,000 participants are each owed a diamond on retirement. The plan holds 1,000 diamonds in a single safe deposit box. One day, a fiduciary steals one of the diamonds. Now there are 1,000 participants, but only 999 diamonds, meaning that each participant's share in the plan has been diminished by one-tenth of one percent. This is a small interest, to be sure, but cognizable—and one suffered by every participant. And

as explained below, it makes perfect sense that when any one participant sues over the breach of duty, it is to recover the missing diamond, rather than that plaintiff's interest of 1/1,000 of a diamond.

Now consider a 1,000–participant and 1,000–diamond defined contribution plan, where each participant holds his or her respective diamond in a safety deposit box. The fiduciary steals the diamond in account 47. The participant who holds box number 47 has seen his interest diminish by 100%, but none of the other participants is harmed financially at all by the breach.

In *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), for example, the Supreme Court examined a suit brought by a participant in a defined benefit plan, seeking damages for her employer's alleged failure to process her benefits claim in a timely manner—that is, damages beyond the benefits to which she was entitled by the ERISA plan. Scrutinizing the language of § 1109(a), the Court concluded that it only provided for recovery to the plan as a whole—the clause was "concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary." 473 U.S. at 142, 105 S.Ct. 3085. It ordered the participant's suit dismissed insofar as it sought compensatory relief. *Id.* at 144, 105 S.Ct. 3085.

The Court reasoned that in order to protect the entire defined benefit plan, the fiduciary had to make good the entire loss to the plan. It would be insufficient merely to make good the proportion of the loss that was suffered by the plaintiff, because the relief would immediately be dispersed in the undifferentiated pool of assets forming the defined benefit plan's fund. And requiring all plan participants to wait until they had an individuated injury would be to require them to wait until it was too late. Because any individual plaintiff might still be able to draw her full benefits from the remainder of the fund's assets upon retirement, an individual plaintiff could only demonstrate an immediate harm where the loss was so grievous that it threatened the financial integrity of the entire defined benefit plan. *See id.* at 142–43 & n. 9, 105 S.Ct. 3085; *see also*

*LaRue*, 128 S.Ct. at 1025 (clarifying *Russell*'s holding). Because ERISA was meant to reach breaches of fiduciary duty that did not endanger the entire plan, the Court interpreted the statute as permitting any participant in a defined benefit plan to sue "on the plan's behalf" for any fiduciary breach—that is, to undo the damage that had been done to the pool of assets, however minuscule an individual share may be. *See Russell*, 473 U.S. at 142, 105 S.Ct. 3085.

In the two decades since *Russell*, defined benefit plans have been largely replaced by defined contribution plans. *LaRue*, 128 S.Ct. at 1025 (citing Edward A. Zelinsky, *The Defined Contribution Paradigm*, 114 Yale L.J. 451 (2004)). And notably, the Court's assumption in *Russell* of an undifferentiated pool of assets, to which each plan participant retains a similar, undifferentiated right, no longer holds true. Instead, a defined contribution plan has individual accounts reflecting a particular participant's investments. *See* 29 U.S.C. § 1002(34). In many plans—and in the Plan at bar—the participants' individual accounts, and thus their interests, are differentiable from one another.

Acknowledging the new paradigm, the Supreme Court revisited its holding in *Russell* with respect to defined contribution plans. While *LaRue* does not address standing per se, its reasoning illustrates the limits on a defined contribution plan participant's ability to sue "on behalf of" the plan. *LaRue*, like *Russell* and the instant case,[8] required an interpretation of § 1132(a)(2). The Fourth Circuit held that the plaintiff, a defined contribution plan participant, was not permitted to bring a

---

**8.** The Complaint does not specify the portion of § 1132(a) upon which the plaintiff relies; § 1132(a)(2) is surely the best fit, considering Bendaoud's frequent invocations of the defendants' fiduciary duties. *See, e.g.,* Compl. ¶ 107 (document # 1) ("29 U.S.C. § 1132 provides, in pertinent part, that a civil action may be brought by a participant for relief under … 29 U.S.C. § 1109.").

suit under § 1132(a)(2) and § 1109. Using *Russell* as the model, it reasoned that the relief sought-restitution for a fiduciary breach-would have accrued only to his individual account, not to the plan as a whole. *See LaRue*, 128 S.Ct. at 1023 (quoting *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 450 F.3d 570, 574 (4th Cir.2006)).

The Supreme Court rejected that holding as an out-of-context reading of dicta in *Russell.* It explained,

> The 'entire plan' language in *Russell* speaks to the impact of [§ 1109] on plans that pay defined benefits.... For defined contribution plans, however, fiduciary misconduct need not threaten the solvency of the entire plan to reduce benefits below the amount that participants would otherwise receive.... Consequently, our references to the 'entire plan' in *Russell* ... are beside the point in the defined contribution context.

*Id.* at 1025; *accord id.* at 1029 (Thomas, J., concurring) (reasoning that "assets allocated to petitioner's individual account were plan assets," entitling a participant to sue under § 1109 for losses "to the plan" when their individual account assets were impaired by a breach of fiduciary duty). The Court concluded that § 1132(a)(2) permits a suit for "recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account." *Id.* at 1026 (majority opinion) (emphasis added).

In short, the Supreme Court held that a plaintiff suing for recovery to his own accounts under § 1132(a)(2) did, by definition, seek recovery to the defined contribution plan. The negative implication of that holding is clear: One defined contribution plan participant has no pecuniary interest in the accounts of another. If a defined contribution plan participant sues for a breach of fiduciary duty, his financial recovery must be entirely, and only, to his own accounts.[9] *See also Tullis v. UMB Bank, N.A.*, 515 F.3d 673, 679–81 (6th Cir.2008) (holding that plaintiff need not seek relief that redounds to the benefit of all participants, but may focus suit more narrowly); *In re Schering–Plough Corp. ERISA Litig.*, 420 F.3d 231, 235 (3d Cir. 2005) (same). In this case, Bendaoud need not, and cannot, seek recovery on behalf of another plan participant's financial loss. He was not harmed by that participant's loss, and any recovery to offset that loss will not benefit him in the least.

Of course, a fiduciary's breaches can affect more than one defined contribution plan participant. In that situation, though, the proper approach is joinder of the affected participants or the certification of a class. If Bendaoud suffered a financial injury as a result of the breach, he may properly represent the class. But he may not elide his own lack of injury by claiming that the breach harmed other plan participants even if it did not harm him. *See, e.g., Lewis v. Casey*, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) ("That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured ...." (internal quotations omitted)).

---

**9.** Consider again the second diamond hypothetical in note 7, *supra.* It is clear that ERISA permits only suits for benefits, not for damages. *Russell*, 473 U.S. at 142, 105 S.Ct. 3085; *see also Harzewski v. Guidant Corp.*, 489 F.3d 799, 804 (7th Cir.2007) (explaining distinction between benefits and damages). Therefore, if the holder of account 47 sues the fiduciary for breach of duty, he would be able to recover precisely one diamond, and that diamond must go precisely to account number 47 and nowhere else. No account holder except number 47 is harmed by the breach, and no other account holder stands to gain from the financial recovery.

Imposing this requirement gives effect to at least one of the key reasons for standing doctrines. "[T]hird parties themselves usually will be the best proponents of their own rights. The courts depend on effective advocacy, and therefore should prefer to construe legal rights only when the most effective advocates of those rights are before them." *Singleton v. Wulff*, 428 U.S. 106, 114, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). Where an ERISA plan participant suffers no personal injury as a result of a fiduciary's actions but instead purports to represent other participants, a court must be concerned that the plaintiff will not effectively represent the third party's interests.

The concern has particular weight in the context of a suit "on behalf of" a defined contribution plan, where the participant claims to be suing in a representational or quasi-representational capacity. If Bendaoud were permitted to sue "on behalf of" the Plan, the results of the suit might well bind those third parties who did suffer an injury. And unlike a class action, *see* Fed. R.Civ.P. 23(e), or a stockholder derivative suit, *see id.* 23.1(c), this quasi-representational suit has no built-in protections for absent parties' interests. Requiring Bendaoud to seek class certification ensures the missing procedural protection.

While the limitations on Bendaoud's standing are clear for financial harms, they are much murkier when the plaintiff seeks

to enforce statutory rights that do not necessarily imply an individual financial loss. In the ERISA context, several courts have read standing more broadly when considering a suit for purely prospective relief. *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 433 F.3d 181, 199–200 (2d Cir.2005); *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 456 (3d Cir.2003); *cf. Harley v. Minn. Mining & Mfg. Co.*, 284 F.3d 901, 906–07 (8th Cir.2002) (holding that constitutional standing did not exist because the alleged loss "did not cause actual injury to [the] plaintiffs' interests in the plan"). It is an appropriately flexible approach. ERISA is intended to confer broad rights on plan participants to prevent and remedy financial shenanigans. *See, e.g., Fin. Inst. Ret. Fund v. Office of Thrift Supervision*, 964 F.2d 142, 149 (2d Cir.1992). There might be situations in which it would frustrate the purposes of ERISA to take too narrow a view of which participants can seek prospective relief for a breach.[10]

In this case, though, the distinction between prospective and remedial relief is not at issue. Bendaoud is no longer a participant in the Analog Plan in any way. *See* Granato Second Suppl. Aff. 8, 11–12 (document # 46). Purely prospective relief cannot affect him, so he lacks standing

---

**10.** To return once again to the second diamond hypothetical from notes 7 and 9, *supra:* suppose the holder of account 47 could not or would not sue the fiduciaries at fault (or settled the case early.) It would seem contrary to the purposes of the statute not to allow other participants to seek prospective relief specifically authorized by the statute, such as the removal of the offensive fiduciary. *See* 29 U.S.C. § 1109(a).

It may be entirely possible to reconcile this concern with the Court's standing analysis

above. For example, where a defined contribution plan participant is not financially harmed by a fiduciary's breach of duty but wishes to seek equitable relief, a more appropriate suit might lie under *id.* § 1132(a)(3) (providing equitable relief to "redress" a "violation"), rather than *id.* § 1132(a)(2) and *id.* § 1109 (providing cause of action to force fiduciary to "make good" a loss to the plan, as well as remedial relief for a breach of duty).

to seek it.[11]

■ Since Bendaoud cannot sue for prospective relief, and he cannot sue on behalf of the plan, *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255–56, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); *Russell*, 473 U.S. at 142, 105 S.Ct. 3085, he is limited to seeking to recover benefits that were owed to him but which he did not receive. *See* 29 U.S.C. § 1132(a)(1)(B). That is relief to which he is entitled by ERISA. *See Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008); *Harzewski*, 489 F.3d at 805. The right is plainly his own to assert, flowing from his participation in the Plan at the time of the alleged fiduciary breach and Bendaoud's investment in the asset that was the subject of the alleged breach. Bendaoud may still recover money damages if he can prove an injury for which that is the appropriate redress. The Court now turns to whether he has alleged such an injury.

## B. *Whether Bendaoud Has Alleged an Injury In Fact*

The Complaint alleges three broad theories of harm. The first two pertain to Bendaoud's alleged financial loss. Under the first theory, Bendaoud's financial stake in the Analog Stock Fund declined in value because of the defendants' actions. *See* Compl. ¶ 122 (document # 1). However, the stock market did not learn of the allegedly improper stock option practices until after Bendaoud had sold his interest in the Analog Stock Fund. As a consequence, the Court concludes that Bendaoud cannot show that the defendants' actions *caused* the value of his holding to decline.

Bendaoud's second theory is that regardless of whether the value of his posi-

**11.** This inquiry arguably fits more comfortably under the "redressability" prong of the standing inquiry, rather than the "injury" inquiry. In *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), though, the Supreme Court treated an analogous question as one of injury. "Lyons' standing to seek the injunction requested depended on whether he was likely to suffer future injury from the use of the chokeholds by police officers." *Id.* at 105, 103 S.Ct. 1660; *see id.* at 111, 103 S.Ct. 1660 (concluding that Lyons had no such likelihood of future injury). The Court analogized Lyons's position to that of any other citizen of Los Angeles, given that he could not demonstrate that he was any more likely than another to fall victim again to the chokeholds. *Id.* at 111, 103 S.Ct. 1660.

In the instant case, by contrast, ERISA plainly contemplates that equitable relief similar to an injunction may be imposed for a single past violation, even if that does not of itself predict a similar future harm. *See* 29 U.S.C. § 1109(a) (providing that a fiduciary's breach of duty may be remedied by "other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary"). Bendaoud's problem, however, does not flow from whether he has suffered an injury, but whether the Court's imposition of equitable relief would affect him. (In *Lyons*, there was certainly no question that the injunctive relief the plaintiff sought would have remedied the future injury he feared.)

On the other hand, the "redressability" prong of standing has traditionally examined whether or not an injunction entered against the defendant would affect the plaintiff because of the intervening action of a third person. *See, e.g., Linda R.S. v. Richard D.*, 410 U.S. 614, 618, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *see also* Def. Suppl. Mem. 4 n.6 (document # 48) (so characterizing redressability where the plaintiff's claim for support payments from her child's father, depended upon whether the state exercised its authority to bring criminal charges against him and whether that intervention would have resulted in support rather than the jailing of the child's father). Regardless of how it is characterized, the issue of whether Bendaoud will be affected by any equitable relief is a standing question, because it determines whether he has the requisite "personal stake" in the litigation, the baseline from which the prongs of the test are derived. *See, e.g., Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

tion declined, he was harmed by making the investment in the first place. That is, he argues that the Analog Stock Fund was an imprudent investment option and that the defendants withheld material information from him when he was making his investment decisions. *See id.* ¶¶ 124, 142, 146. Those breaches of fiduciary duty, he argues, should be remedied by comparing how he fared while investing in the Analog Stock Fund to how he would have fared if he had made an alternative investment. The Court agrees that this is a cognizable injury under ERISA.

Bendaoud's final theory is not that his own finances suffered, but that the fiduciaries unlawfully gained personal profits through the "use of" Plan assets. *See* Compl. ¶ 108, Prayer for Relief B (document # 1); 29 U.S.C. § 1109(a) (imposing liability on fiduciaries which may include "restor[ation] to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary"). However, the Court concludes that the defendants' unlawful gains did not come through the "use of" Plan assets.

The Court examines each theory in turn.

1. ***Economic Loss to Analog Stock Fund Holdings as a Result of the Backdating***

■ The defendants' central standing argument turns on the timing of Bendaoud's investments. The first allegedly improper option backdating occurred in 1999. The plaintiff first bought in to the Analog Stock Fund in July 2000, and cashed out of it entirely in December 2002. The first hint of dodgy compensation practices came in 2004. Thus, the defendants conclude, even if the backdated options caused the price of the stock to "plummet," they could not have done so while Bendaoud held them, because the plummeting could not logically have occurred until the

market learned of the practice. *See* Def. 12(b)(1) Mem. 5–7 (document # 14).

The defendants primarily rely on *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). In that securities case, the plaintiffs alleged that Dura had made material misrepresentations regarding whether the Food and Drug Administration would approve its asthmatic spray device. *Id.* at 339, 125 S.Ct. 1627. As a consequence, the plaintiffs claimed, they had "paid artificially inflated prices for Dura securities and ... suffered damages thereby." *Id.* at 339–40, 125 S.Ct. 1627 (internal quotation omitted). It was the only theory of causation the plaintiffs alleged. The Ninth Circuit held that the " 'plaintiffs establish loss causation if they have shown that the price on the date of purchase was inflated because of the misrepresentation.' " *Id.* at 340, 125 S.Ct. 1627 (emphasis omitted)(quoting *Broudo v. Dura Pharms., Inc.,* 339 F.3d 933, 938 (9th Cir.2003)). The Supreme Court unanimously reversed. It explained that "as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value." *Id.* at 342, 125 S.Ct. 1627. And given the securities laws' requirement that the plaintiff demonstrate an actual economic loss, *see id.* at 343–44, 125 S.Ct. 1627, the complaint failed to adequately allege proximate cause, *id.* at 347, 125 S.Ct. 1627. *See also In re Credit Suisse–AOL Secs. Litig.,* 465 F.Supp.2d 34 (D.Mass.2006) (discussing *Dura* and *Lentell v. Merrill Lynch Co.,* 396 F.3d 161 (2d Cir.2005), in context of loss causation). In this case, too, the defendants argue, Bendaoud has only alleged that he bought and sold the ADI stock at an artificially inflated price.

The plaintiff attempts to distinguish *Dura* by arguing that it applies only in the context of securities-law fraud actions, which are similar to common-law misrepresentation actions (as opposed to an ERISA fiduciary suit, more akin to the law of trusts.) Pl. 12(b)(1) Opp. 13–14 (document # 30). That reasoning is unpersuasive. The pleading and cause of action requirements for ERISA claims are indeed different from their securities counterparts. But *Dura* pivots on a holding that is not about securities-specific "loss causation"; it is about proximate causation generally.[12] *See* 544 U.S. at 342–43, 125 S.Ct. 1627 (discussing the effects of an inflated market price on investors); *Merrill Lynch v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir.2007) (explaining that "[t]he concept of loss causation elucidated in *Dura* is closely related to the common law doctrine of proximate cause"); *In re Credit Suisse*, 465 F.Supp.2d at 46–47 (tying *Dura* to proximate cause inquiries).

On the facts of this case, *Dura* forecloses the plaintiff's claims of economic loss to his Analog Stock Fund holdings. Bendaoud's theory of causation of how the defendants' acts caused his loss is as follows: the purchase of the stock took place at an artificial high because of the defendants' actions; subsequent disclosures to the market of the defendants' financial malfeasance caused the price to fall; and he sold the stock at a loss that would not have been incurred but for the defendants' actions. But Bendaoud was not still holding his stock when the price fell due to the disclosures.[13] Thus, he only alleges that he both bought and sold ADI stock at an inflated price.[14] After *Dura*, that alone does not demonstrate that the defendants' actions proximately caused his position in the Analog Stock Fund to lose value. Under Bendaoud's allegations as they stand, there exists no set of facts in which the value of his investment in the Analog Stock Fund was harmed by the inflationary pressure of the backdated options.[15]

**12.** Plaintiffs' citation to *Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir.1995), is inapposite. Clearly, in that case, the plaintiffs alleged a loss: during the time the plaintiffs' Plan held the stock, the share price declined by some $40.00 per share. *See id.* at 1451. The question was whether the fiduciary's failure to investigate the investment decision led to the loss, or whether unrelated intervening factors did. Here, Bendaoud sold his stock before the decline occurred.

**13.** The fact that Bendaoud was no longer holding his stock when its price—and thus its value—declined is what distinguishes this case from *Merrill Lynch*, 500 F.3d 171. In that case, the plaintiff purchased a business whose value was fraudulently overstated. After the purchase was completed, the plaintiff learned the true value of the business—and disclosure and the decline in value of the purchased business happened simultaneously. Consequently, in that case, damages were accurately represented as the difference between the purchase price and the actual value of the purchased company. *See id.* at 183.

**14.** Bendaoud does argue that his allegations extend beyond those in *Dura*. He contends that "[a]fter the market learned about the improper options backdating, [ADI's] stock traded at approximately $30 per share," a decline of $50 or $60 from the price Bendaoud paid through the Fund. *See* Pl. 12(b)(1) Opp. 12–15. But as explained above, Bendaoud can only seek relief for his own injuries, and it is undisputed that he sold his interest in the Analog Stock Fund well before the relevant information was disclosed to the market. *See* Granato Aff. ¶¶ 9, 31 (document # 15).

**15.** To see why this is so, consider a simple hypothetical. A company fails to disclose material information that would have caused its share price to decline from $5.00 to $4.00 prior to the purchase. After that failure, an investor decides to buy $200.00 worth of the company's stock—40 shares at $5.00 each. While she holds the stock, the company appreciates in value by 10%, increasing the price of each of her shares to $5.50. She sells those shares before the information is disclosed for a total of $220.00.

*Cf. In re Credit Suisse,* 465 F.Supp.2d at 47 & n. 13 (discussing situations in which misrepresentations can cause a loss).

### 2. *Bendaoud's Economic Loss as a Result of Investing in the Analog Stock Fund*

■ Bendaoud's second theory of loss is that he would not have made any investment in the Analog Stock Fund but for two breaches of trust. The first breach, he says, was the defendants' failure to remove it as an investment option despite the increased risk it carried because of the backdated stock options. The second was their failure to disclose material information regarding the Fund. The two alleged breaches are distinct, but closely related.

According to Bendaoud's first alleged breach, the price of ADI stock was inflated beyond its real value because the backdated options constituted a type of undisclosed liability, and the defendant fiduciaries knew of the inflation. Furthermore, they knew or should have known that the disclosure of the backdating practice would cause the stock price to fall, harming participants with holdings in the Analog Stock Fund. Although this did not happen while Bendaoud had a position in the Fund, the plaintiff reasons, it *might* have done so. Therefore, the theory goes, the fiduciaries exposed him to an unacceptable level of risk in offering the Stock Fund for investment. *See* 29 C.F.R. § 2550.404a–1(b)(2)(i) (requiring fiduciary to determine "that the particular investment or investment course of action is reasonably de-

signed ... to further the purposes of the plan, taking into consideration the risk of loss ... associated with the investment or investment course of action").

The mere fact that Bendaoud did not actually suffer injury does not excuse the fact that the investment was imprudent, he argues. "[W]hether a fiduciary's actions are prudent cannot be measured in hindsight, whether this hindsight would accrue to the fiduciary's detriment or benefit." *DiFelice v. U.S. Airways,* 497 F.3d 410, 424 (4th Cir.2007)(citing *Roth v. Sawyer–Cleator Lumber Co.,* 16 F.3d 915, 917–918 (8th Cir.1994)). Here, hindsight would benefit the fiduciaries—but the prudence of the investment option must be evaluated as of the time it was offered to the plaintiff. *See id.* (citing *Bussian v. RJR Nabisco, Inc.,* 223 F.3d 286, 299 (5th Cir.2000)). And although Plan participants directing their investments in a defined contribution plan must bear some risk of loss, *see* 29 U.S.C. § 1104(c), fiduciaries may still be held liable "for assembling an imprudent menu" of investment choices, *e.g., DiFelice,* 497 F.3d at 418 n. 3 (approving theory and citing cases). Moreover, fiduciaries have an ongoing duty to monitor individual investment options to ensure that they remain prudent. *Id.* at 423–24.

■ Similarly, in the alleged second breach, the fiduciaries failed to disclose material information—the backdating practice—regarding the Stock Fund. Detrimentally relying on the misleading description of the Stock Fund, Bendaoud invested in that aspect of the Plan.[16] Of-

---

Now suppose that the information was not withheld, and the stock price did in fact decline to $4.00. The investor's $200.00 would now purchase 50 shares at $4.00 each. Assuming the same 10% appreciation, the share price increases to $4.40. When she sells those shares, she again receives $220.00.

**16.** The defendants argue that this theory is not viable because it creates too great a degree of overlap with the securities laws; they argue that Bendaoud only identifies allegedly misleading statements in public securities filings. *See* Def. 12(b)(6) Mem. 7–8 (document # 9). For the reasons explained below, *see* section IV.B, *infra,* the Court does not find this contention persuasive here.

fering misleading information in an ERISA prospectus is an actionable breach of fiduciary duty. *See, e.g., Frommert v. Conkright,* 433 F.3d 254, 270–72 (2d Cir.2006); *James v. Pirelli Armstrong Tire Corp.,* 305 F.3d 439, 449 (6th Cir.2002); Restatement (Third) of Trusts § 78(3) (2007) ("[A] trustee has a duty in dealing with a beneficiary to deal fairly and to communicate to the beneficiary all material facts the trustee knows or should know in connection with the matter.").

Each alleged breach plainly constitutes an "injury in fact." *See Evans,* 534 F.3d 65, 74 (1st Cir.2008). Each is an alleged invasion of personal entitlements Bendaoud holds-the trustees' duties to the principal of loyalty, good faith, and care. A difficulty remains: how to assess the relief to which Bendaoud claims to be entitled. Bendaoud can only recover if he can show that if his entitlements had been honored, the value of his investments would have been greater when he cashed out of the Plan. *See id.* at 73–74; *Harzewski,* 489 F.3d at 804–805; *In re Mutual Funds Inv. Litig.,* 529 F.3d 207, 215–16 (4th Cir.2008).[17]

At this stage of the litigation, that difficulty does not bar Bendaoud from proceeding. As the First Circuit recently explained,

> [T]here is nothing in ERISA to suggest that a benefit must be a liquidated amount in order to be recoverable. Losses to a plan from breaches of the duty of prudence may be ascertained, with the help of expert analysis, by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio. At this early stage in the proceedings, the plaintiffs need not be able to show the precise amount of additional benefits to which they are entitled. Indeed, they need not even state a claim on which they are *likely* to succeed; they need only state a *colorable* claim.

*Evans,* 534 F.3d at 74 (internal quotation marks and citations omitted) (citing *Harzewski,* 489 F.3d at 807, and *Graden v. Conexant Sys. Inc.,* 496 F.3d 291, 301 (3d Cir.2007)). Bendaoud has advanced a colorable claim: he has urged the Court to adopt the damage-calculation rule used by the Second Circuit in *Donovan v. Bierwirth,* 754 F.2d 1049 (2d Cir.1985). *See* Pl. 12(b)(1) Opp. 15 n.9 (document # 30); *see also* Compl. ¶¶ 122, 126 (document # 1) (stating that Analog stock "was not a suitable and appropriate investment" and demanding that the defendants "restore the vested benefits" lost due to the fiduciaries' imprudence).

In *Donovan,* the ERISA plan fiduciaries for the Grumman Corporation used plan funds to defeat a tender offer that would have resulted in another corporation gaining a controlling interest in Grumman. *Donovan,* 754 F.2d at 1051. When the shares purchased to defeat the tender offer were eventually sold, the plan obtained a profit of $11.41 per share. *Id.* Despite the profit, plan beneficiaries brought suit, alleging a breach of fiduciary duty. The Second Circuit found the plaintiffs stated a claim for injury. It reasoned from the Restatement (Second) of Trusts § 205(c) (1959), which holds fiduciaries liable for "any profit which would have accrued to the trust estate if there had been no breach of trust." *See Donovan,* 754 F.2d

---

17. The fact that this type of relief may be unavailable under 29 U.S.C. § 1132(a)(3), *see Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 214–15, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), does not foreclose its being available under § 1132(a)(2). It is a "loss[ ] to [the] plan resulting from" the breach of a fiduciary's duty.

at 1054–56. Therefore, the Second Circuit held:

> One appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust. . . . [W]e hold that the measure of loss applicable under [29 U.S.C. § 1109] requires a comparison of what the Plan actually earned on the [imprudent] investment with what the Plan would have earned had the funds been available for other Plan purposes. If the latter amount is greater than the former, the loss is the difference between the two; if the former is greater, no loss was sustained.
>
> In determining what the Plan would have earned had the funds been available for other Plan purposes, the district court should presume that the funds would have been treated like other funds being invested during the same period in proper transactions. Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these. The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty. Any doubt or ambiguity should be resolved against them.

*Id.* at 1056 (citations omitted). While the First Circuit has never examined *Donovan*, it endorsed the same sort of comparative approach in *Evans*. *See* 534 F.3d at 74 ("Losses to a plan from breaches of the duty of prudence may be ascertained, with the help of expert analysis, by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio.").

Whether the plan actually earned a profit despite the breach does not matter under the *Donovan* rule. Indeed, the plaintiffs in that case made a healthy profit. As the Second Circuit later clarified, "[i]f, but for the breach, the Fund would have earned even more than it actually earned, there is a 'loss' [within the meaning of 29 U.S.C. § 1109] for which the breaching fiduciary is liable." *Dardaganis v. Grace Capital, Inc.*, 889 F.2d 1237, 1243 (2d Cir. 1989).

For present purposes, the Court accepts the plaintiff's proposal of a damage calculation like the one in *Donovan*. If Bendaoud can prove either alleged breach of fiduciary duty and can prove that an alternative investment would have garnered a greater return, he is entitled to the difference. *See Donovan*, 754 F.2d at 1055–56; *Evans*, 534 F.3d at 74.

### 3. The Fiduciaries' Unlawful Profit Through "Use Of" Plan Assets

■ Bendaoud's last theory of harm is that the defendants used Bendaoud's investments in the Analog Stock Fund to make a profit for themselves. If they did so, Bendaoud would have a valid cause of action. *See, e.g., Felber v. Estate of Regan*, 117 F.3d 1084, 1087 (8th Cir.1997); *Berish v. Bornstein*, 437 Mass. 252, 271–72, 770 N.E.2d 961 (2002) (holding remedy for willful breach of fiduciary duty resulting in personal gain to include disgorgement); Restatement (Second) of Trusts § 205 (1959) (suggesting same). It is irrelevant to this claim whether Bendaoud himself suffered a monetary loss. However, the defendants reply that Bendaoud has failed to state such a claim because there is no contention that the fiduciaries "used" "Plan assets." *See* Def. Mem. Supp. Mot. Dismissal Pursuant to 12(b)(6) ("Def.12(b)(6) Mem.") at 19–20 (document # 9). The Court agrees.

The term "assets of the plan" in § 1109(a) is to be given a broad, functional

definition. *See, e.g., Acosta v. Pac. Enters.*, 950 F.2d 611, 620 (9th Cir.1991). However, there is no meaningful sense in which the stock options the executives received were "Plan assets." They were awarded to the fiduciaries as part of a compensation package. Neither the options themselves nor the shares of stock acquired by exercising them formed part of the Analog Stock Fund. Nor have the plaintiffs presented a theory by which the defendants employed the shares of stock the Plan did hold to reap a profit. Bendaoud has failed to state a claim upon which relief can be granted for the disgorgement of profits. *See also* section IV.B, *infra* (discussing which alleged acts were taken as corporate officers and which were taken as ERISA fiduciaries).

## IV. WHETHER BENDAOUD HAS STATED A CLAIM UPON WHICH RELIEF CAN BE GRANTED

As discussed above, Bendaoud has alleged an actual injury in that he claimed that but for the fiduciaries' breaches of duty, he would not have invested in the Analog Stock Fund, and his overall holdings in the Plan would have been more valuable than they actually were. The Court now turns to the defendants' remaining arguments, presented in their second Motion to Dismiss.

The defendants' arguments fall into four classes. First, certain defendants must be dismissed because they are not fiduciaries, as is required for a suit under 29 U.S.C. §§ 1132(a)(2)[18] and 1109. Second, the complained-of acts were not acts undertaken by the defendants in their capacities as ERISA fiduciaries, but as corporate officers. Third, even if the defendants made misstatements, those misstatements were not "material" so as to give rise to liability. Finally, the relief the plaintiff seeks is unavailable. Each argument is addressed in turn.

### A. Which Defendants Are Amenable to Suit as ERISA Fiduciaries

The defendants first argue that most of the individual defendants named in the suit are not ERISA fiduciaries. Therefore, they contend, they are not proper defendants to this suit. Under ERISA,

> a person is a fiduciary with respect to a plan to the extent (I) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). In addition, anyone explicitly named as a fiduciary in the Plan is also a fiduciary. *Id.*

The defendants point out that the Plan, by its terms, only names three fiduciaries explicitly: ADI itself, the Plan's Administrative Committee, and the Plan Trustee. The Investment Partnership Plan 2001 Restatement ("Plan Restatement") at 62,

---

**18.** Again, although the plaintiff does not specify which part of the statute is the basis for his suit, § 1132(a)(2) is the most appropriate one. Only one other paragraph is potentially applicable, § 1132(a)(3). The Supreme Court has glossed that statute as providing for individual equitable relief only where adequate relief is not available elsewhere in the statute. *Varity Corp. v. Howe*, 516 U.S. 489, 512, 515, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). As explained above, the restitution of owed benefits is available under § 1132(a)(2); therefore, that is the provision Bendaoud may use.

Bates ADI 000353, Ex. E to Dube 12(b)(6) Aff. (document # 13). They thus concede that ADI is a proper fiduciary defendant. Moreover, since the Plan contemplates that the members of the committee exercise discretionary authority in managing the Plan's assets, *see id.* 62–64, Bates ADI 000353–55, each member of the Administrative Committee is also a properly named fiduciary defendant.[19] One defendant, Joseph McDonough, is a current member of the Administration Committee. *See* TIP Prospectus, Appendix A 1, Bates ADI 000236, Ex. A to Dube 12(b)(6) Aff. (document # 13). Finally, the last named fiduciary is the Trustee—the Fidelity Management Trust Company. TIP Prospectus 1, Bates ADI 000220, Ex. A to Dube 12(b)(6) Aff. (document # 13). It is not named as a defendant in this case. In the defendants' estimation, every other defendant should be dismissed for inadequate pleading as to their fiduciary status. *See* Def. 12(b)(6) Mem. 14–17 (document # 9).

The plaintiffs counter that their lack of specific pleading is due to the defendants' refusal to turn over important information permitting them to determine who is an ERISA fiduciary. Under the rules of notice pleading, they argue, they need only allege that the defendant acted in his or her fiduciary capacity, and in doing so, breached the duty owed to the Plan. Pl.'s Mem. in Opp'n to Def.'s Mot. Dismissal Pursuant to 12(b)(6) 8–10 (document # 31).

The plaintiffs are largely correct. Whether a party is an ERISA fiduciary is a functional, fact-bound question. *See* 29 U.S.C. § 1002(21)(A); *Briscoe v. Fine,* 444 F.3d 478, 486 (6th Cir.2006) ("Whether a

person or entity qualifies as a fiduciary is . . . a mixed question of law and fact. . . ."). Parties who are not named fiduciaries may nevertheless be liable if they have sufficient responsibility to meet the statutory definition of a fiduciary. *See, e.g., Briscoe,* 444 F.3d at 487–88. The plaintiffs should therefore have an opportunity to discover more about the named defendants' role, if any, in the "management or disposition of" the Plan's assets; whether they served as investment advisors; or whether they had any discretionary authority in the administration of the Plan. *See* § 1002(21)(A).

Moreover, the Plan at issue here contains the following provision:

14.6 Procedure for Allocation and Delegation of Responsibilities. The members of the Committee, the Board of Directors of the Employer, or a committee of such Board may allocate among themselves in any reasonable manner their responsibilities and may designate any other person or persons to carry out any of their responsibilities by so specifying in a written instrument. No Committee member or director will be liable for the improper discharge or non-performance of any responsibility so allocated or delegated to another person, except to the extent liability is imposed by the law.

Plan Restatement 63, Bates number ADI 000354, Ex. E to Dube 12(b)(6) Aff. (document # 13). The Plan thus contemplates that additional fiduciaries may be named in a written document. Without discovery, it would be inappropriate to rule out any of the named defendants who are alleged to be fiduciaries.

---

**19.** While the plan participants are able to direct their investments into particular options, ADI, the Committee, and the Plan Trustee each have the general duty to "control and manage the operation and administration

of the Plan." *Id.* 62, Bates ADI 000353. That duty plainly encompasses, among other tasks, assembling the menu of options from which participants can choose and providing participants information on each.

The defendants contend that an individual whose corporate acts bear tangentially on the Plan is not thereby transformed into an ERISA fiduciary. *See* Def. 12(b)(6) Mem. 4–7 (document # 9). That is certainly correct. *See, e.g., In re World-Com, Inc., ERISA Litig.,* 263 F.Supp.2d 745, 760–61 (S.D.N.Y.2003) (comparing *Pegram v. Herdrich,* 530 U.S. 211, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) and *Varity Corp. v. Howe et al.,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)). But as explained below, an individual may be simultaneously an ERISA fiduciary and a corporate officer, and the Court cannot say that the defendants have ruled out the possibility that the defendants exercised authority and discretion with respect to the Plan. Those who do not meet the statutory definition should be voluntarily dismissed at a later stage of the litigation, or their status may be adjudicated on summary judgment.

■ However, the plaintiffs have not alleged a fiduciary duty with respect to every defendant. Defendants Samuel Fuller, Russell Johnsen, and Samuel McAloon are not alleged to have had any ERISA fiduciary capacity, and the only grounds for liability stated in the Complaint is that they took improper stock options. *See* Compl. ¶¶ 30, 73 (Fuller); *id.* ¶¶ 31, 74 (Johnsen); *id.* ¶¶ 32, 75 (McAloon) (document # 1). As explained below, even if true, that is a corporate act, not an ERISA one, and cannot form the basis for liability in an ERISA suit. Therefore, **defendants Fuller, Johnsen, and McAloon must be DISMISSED.**

### B. *Whether the Defendants' Acts Were Those of ERISA Fiduciaries*

Next, the defendants contend that the acts with which they are charged fall outside the scope of the Plan—they are merely corporate business activities, not Plan activities. Def. 12(b)(6) Mem. 4–7 (document # 9). The Court looks again to the definition of "fiduciary" under ERISA. A person is a fiduciary only "to the extent" that she undertakes the actions or exercises the authority delineated in the statute. 29 U.S.C. § 1002(21)(A). Thus, unlike a traditional fiduciary, the ERISA fiduciary has considerable room in which to act without implicating his or her ERISA obligations. For example, without offending ERISA, an ERISA fiduciary may undertake a corporate act like firing the beneficiary for reasons unrelated to the ERISA plan. *See Pegram v. Herdrich,* 530 U.S. 211, 225, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). It will only give rise to ERISA liability if the defendant performed the act while "wearing the hat" of an ERISA fiduciary, rather than the hat of a corporate officer. *Id.*

In this case, it is necessary to examine each type of act Bendaoud complains of to determine whether it was undertaken in the defendant's capacity as an ERISA fiduciary. First, setting (and receiving) executive compensation—even improper compensation—is a classically corporate act. *See Eckelkamp v. Beste,* 201 F.Supp.2d 1012, 1021–23 (E.D.Mo.2002). It falls outside the purview of ERISA because it does not directly involve the "management or disposition of [the plan's] assets." 29 U.S.C. § 1002(21)(A)(i). The defendants are alleged to have taken improper actions that materially affected the value of ADI common stock, and thereby the Plan participants' holdings in the Analog Stock Fund. Therefore, the plaintiffs contend, when the defendants backdated their stock options, they were "exercis[ing] ... discretionary authority or discretionary control respecting management of [the] plan or exercis[ing] ... authority or control respecting management or disposition of its assets." *Id.*

But the plaintiff's argument elides an important distinction between ADI common stock and ADI common stock *held* in the *Analog Stock Fund.* Stock held in the Fund is only a subset of common stock in circulation. Assuming that the backdating affected the value of common stock, it affected equally the value of all ADI common stock, not just the stock held by plan participants. It was plainly not a decision made with the Plan in mind.

A persuasive analogy is poor financial decisionmaking by a person who is both a corporate officer and an ERISA fiduciary. Even if the executive's poor corporate strategic decisions render worthless the company's stock, thereby harming the value of an employee's ERISA plan holdings, those decisions do not constitute a breach of his ERISA fiduciary duties. *See, e.g., Sengpiel v. B.F. Goodrich Co.,* 156 F.3d 660, 666 (6th Cir.1998). The backdating therefore could not have constituted the "exercise[ ][of] authority or control respecting management or disposition of [Plan] assets." 29 U.S.C. § 1002(21)(A)(i). The mere authorization and receipt of backdated stock options does not implicate any ERISA fiduciary duties, and cannot form the basis for liability here. *See Pegram,* 530 U.S. at 225, 120 S.Ct. 2143.

On the other hand, the defendants may have been acting in their ERISA fiduciary capacities when they made affirmative statements about the company's executive compensation practices in Plan documents. The defendants argue to the contrary, claiming that those "public filings and press releases amounted to disclosures by Defendants in their capacity as corporate fiduciaries to the entire market in general, and not as some exercise of authority or control with respect to the management or disposition of plan assets." Def. 12(b)(6) Mem. 7 (document # 9)(emphasis in original). They further argue

that the only misstatements Bendaoud has identified came in those public filings, not in Plan documents. *See id.* 7–8. The defendants are not quite correct. Merely signing a securities filing, even one that the signer knows will be incorporated into an ERISA document, does not create ERISA fiduciary status; it is a solely corporate act. But a person who is already an ERISA fiduciary may make a misstatement by incorporating a false document in the materials distributed to Plan participants. *See WorldCom,* 263 F.Supp.2d at 766 (holding that ERISA fiduciary could be held liable for material false statements made in securities filings incorporated into prospectus); *In re Schering–Plough Corp. ERISA Litig.,* No. 03–1204, 2007 WL 2374989, at *5–6 (D.N.J. Aug.15, 2007) (same); cf. *Kirschbaum v. Reliant Energy, Inc.,* 526 F.3d 243, 257 (5th Cir.2008) (holding that SEC filings that were distributed to plan participants as holders of the company's common stock, but which were not incorporated into Plan documents, did not give rise to ERISA fiduciary liability).

Here, the Plan incorporated by reference "any future filings made with the SEC under Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act." *See* Prospectus 15–16, Bates ADI 000234–235, Ex. A to Dube 12(b)(6) Aff. (document # 13). Form 11–K Annual Reports are made pursuant to § 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(d). The Complaint alleges material *misstatements* in the 11–K Annual Reports. *See* Compl. ¶ 42 (document # 1). Similarly, proxy statements are made under § 14 of the Securities Exchange Act, 15 U.S.C. § 78n. The proxy statements, too, are alleged to have contained material false statements. *See* Compl. ¶¶ 66–70 (document # 1). By incorporating the Annual Reports and the proxy statements into the Plan materials, ADI's ERISA fiduciaries took responsibili-

ty for their content—an act taken in their capacity as fiduciaries.[20]

### C. Whether the Plaintiff Has Sufficiently Alleged a Material Misrepresentation

The defendants next contend that even assuming Bendaoud's claims are true, his suit must fail because the information the defendants allegedly withheld is immaterial as a matter of law. While ERISA imposes on fiduciaries no explicit disclosure requirements, it does incorporate the standards of the common law of trusts. *Varity,* 516 U.S. at 506, 116 S.Ct. 1065. One of a fiduciary's duties is thus to disclose "material facts affecting the interest of the beneficiary which [the fiduciary] knows the beneficiary does not know and which the beneficiary needs to know for his protection." Restatement (Second) of Trusts § 173, cmt. d (1959). *See Watson v. Deaconess Waltham Hosp.,* 298 F.3d 102, 118 (1st Cir.2002) (noting that "[m]any of our sister circuits have held that, in certain circumstances, a fiduciary has an obligation to accurately convey material information to beneficiaries, including material information that the beneficiary did not specifically request," but not explicitly joining them); *Alves v. Harvard Pilgrim Health Care,* 204 F.Supp.2d 198, 214

(D.Mass.2002) (finding such a duty). The defendants argue that the Court should take notice of the fact that total amount of non-cash charges ADI was forced to take as a result of the options backdating amounted to less than 1% of the company's revenue over seven years. They also suggest the Court take judicial notice of the fact that the price of ADI stock declined gradually instead of "plummeting," as the plaintiff characterize it.

In the ERISA context, "a misrepresentation is 'material' if there was a substantial likelihood that it would have misled a reasonable participant in making an adequately informed decision about whether to place or maintain monies in the [plan]." *In re Unisys Sav. Plan Litig.,* 74 F.3d 420, 442 (3d Cir.1996). This standard is similar to the "materiality" standard under the securities laws. *Cf. Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.") (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

---

**20.** The defendants' argument at the hearing—that imposition of this requirement would force them to violate laws forbidding insider trading—is unpersuasive. Certainly an ERISA trustee would be forbidden from trading on inside information, even to benefit the plan. *See Harzewski,* 489 F.3d at 808. Trading or failing to trade on inside information, however, need not be Bendaoud's theory of liability. Misstatements also suffice. Nor does the duty to speak truthfully to the Plan conflict with any corporate duties. Indeed, it fits hand in glove with the duty to speak truthfully to the SEC.

The Court need not, and does not, decide the proper course of action for a fiduciary who is considering whether to incorporate a

document and thereby provide false information to the plan, but who risks harming the plan's financial interests by disclosing the truth to the public. Notably, however, the Secretary of Labor has identified three possible courses of action: disclose the relevant information to the plan beneficiaries and the public at large; eliminate the company stock as an investment option; and notify the appropriate regulatory authorities. *See In re Enron Corp.,* 284 F.Supp.2d 511, 565–66 (S.D.Tex.2003) (quoting from amicus brief by Secretary of Labor). *See also WorldCom,* 263 F.Supp.2d at 767 (rejecting conflict between insider trading laws and fiduciary duties); *In re Syncor ERISA Litig.,* 351 F.Supp.2d 970, 985 (C.D.Cal.2004) (same).

In suggesting that the backdated options were not material because they only had a minimal impact on net income, the defendants rely in part on ADI's calculation of materiality according to SEC Staff Accounting Bulletin No. 99 ("SAB 99"), 64 Fed.Reg. 45150 (Aug. 19, 1999). *See* Def. 12(b)(6) Mem. 9 (document # 9); Analog Devices, Inc., Current Report (Form 8–K) (Nov. 15, 2005), Ex. C to Dube 12(b)(6) Aff. (document # 13). SAB 99 suggests that, as a rule of thumb, misstatements are only material if they result in an overstatement of net income or an overstatement of earnings per share of five percent or more. *See* SAB 99, 64 Fed.Reg. at 45151.

The rule is not as absolute as the defendants imply. SAB 99 itself notes that the five percent rule "cannot appropriately be used as a substitute for a full analysis of all relevant considerations." *Id.* Indeed, the SEC is considering clarifying its materiality standards to emphasize more heavily qualitative versus quantitative criteria. *See* Request for Comments, Subcomm. Reports of the SEC Advisory Comm. on Improvements to Fin. Reporting, 73 Fed.Reg. 29808, 29819–20 (May 22, 2008) (noting that bright-line five percent rule is "not consistent with the total mix standard established by the Supreme Court"); Notice, Progress Report of the Advisory Comm. on Improvements to Fin. Reporting to the United States Sec. & Exch. Comm'n, 73 Fed.Reg. 10898, 10920–22 (Feb. 28, 2008).

The minimal record on a motion to dismiss does not adequately address the relevant qualitative factors. Most notably, the Court cannot determine whether proper disclosure of the backdated options would have made a reasonable investor question whether other malfeasance would occur (or be revealed) in the future. Arguably, that consideration is particularly important here, where earnings statements were amended not for a calculation error but due to several instances of corporate officers' alleged fraud taking place over a substantial period of time. And while the defendants suggest that the Court use the market price of a share of ADI stock as a proxy for whether the disclosure was material, the Court cannot do so without further knowledge of possible confounding factors in the market.

Although Bendaoud may face an uphill battle, it cannot be said on this record that the defendants' failure to disclose the backdating practice was immaterial as a matter of law.

### D. *Whether the Relief Plaintiff Seeks Is Available*

Finally, the defendants argue that Bendaoud cannot seek monetary relief under ERISA. They first contend that "[r]elief under [ERISA] section 502(a)(2) [29 U.S.C. § 1132(a)(2)] may not flow directly to individual plan participants." Def. 12(b)(6) Mem. 17 (document # 9). While the defendants are correct, that does not mean that the relief Bendaoud requests cannot be credited to his account. *See LaRue,* 128 S.Ct. at 1026 ("[A]lthough § [1132(a)(2)] does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account."); *Evans,* 534 F.3d at 74 (rejecting argument that plaintiffs' injuries were unredressable because relief flowed to the plan, rather than to them individually). As discussed above, Bendaoud may seek his requested relief, including restitution, under 29 U.S.C. § 1132(a)(2). He is entitled to the contents of his Plan accounts as they would have been but for the defendants' alleged breaches of fiduciary duty. The Court therefore need not reach the parties' argu-

ments regarding whether the relief is unavailable under § 1132(a)(3).

## V. *THE RELEASE*

A final issue remains to be addressed. The defendants assert as an affirmative defense that Bendaoud released his claims against them for valuable consideration on October 6, 2005. And indeed, the document Bendaoud signed appears to bar the instant suit. *See* Release 1–2, Ex. C to Dube Aff. Supp. Def. Mot. Dismiss Pursuant to Rule 12(b)(1) ("Dube 12(b)(1) Aff.") (document #16) (specifically waiving rights to bring suit under ERISA). The defendants style it as a matter of standing. It is, they say, "[f]urther proof of [Bendaoud's] lack of injury related to the allegedly improper options-granting practice." Def. 12(b)(1) Mem. 5–7 (document #14).

Bendaoud counters by arguing that the release does not mention the rights of the Plan to bring suit, and suggests that he cannot release the rights of the Plan. He relies primarily on *Bowles v. Reade*, 198 F.3d 752, 759–61 (9th Cir.1999). *Bowles* involved a defined benefit plan, not a defined contribution plan. *See id.* at 755. It also involved a settlement that purported to release claims in an existing suit brought on behalf of that entire benefit plan. *See id.* at 759. *Bowles* thus directly implicates the quasi-representational capacity used by defined benefit plan participants when suing for a breach of fiduciary duty. *See* section III.A, *supra.* Here, by contrast, Bendaoud held only his individual accounts, and could only release claims on those accounts. Again, other participants in the Plan are irrelevant.

Regardless, waivers of ERISA rights must be made knowingly and voluntarily. *See Rodriguez–Abreu v. Chase Manhattan Bank*, 986 F.2d 580, 587 (1st Cir.1993) (citing *Finz v. Schlesinger*, 957 F.2d 78, 82 (2d Cir.1992)). Such a finding requires

evidence beyond the pleadings—and indeed evidence beyond that offered by the defendants, since it involves factors such as Bendaoud's business sophistication, the amount of consideration he received in exchange, and the amount of time in which he had to think over the matter. *See Finz*, 957 F.2d at 82 (listing six relevant factors); *Rivera–Flores v. Bristol–Myers Squibb Caribbean*, 112 F.3d 9, 12 (1st Cir. 1997) (finding *Finz* factors "helpful, but not exclusive"). Weighing those factors would, at this stage, require speculation as to their direction and heft.

In the defendants' view, the plaintiffs missed their opportunity to submit evidence rebutting the plain language of the agreement. *See* Def. Reply to Pl. First Suppl. Br. 2–3 (document #51). The issue, however, can be more squarely presented without great cost to the defendants. The Court has "broad authority to order discovery, consider extrinsic evidence, and hold evidentiary hearings in order to determine its own jurisdiction." *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir.2001). *See also* Fed. R.Civ.P. 56(f)(2) (permitting the Court to order a continuance of summary judgment briefing in order to allow further discovery). As detailed below, that is precisely what it will order now: abbreviated discovery on the issue of whether the waiver was knowingly and voluntarily made, followed by immediate summary judgment briefing on the waiver. If the plaintiff's case survives summary judgment, the case will proceed on a normal discovery track.

## VI. *CONCLUSION*

Bendaoud has stated two injuries upon which relief may be granted: first, a breach of his statutory entitlement to be presented with prudent investment options, and second, a breach of his entitlement to accurate information regarding

those investments. While he must show a monetary loss, he need not show that the actual value of his Analog Stock Fund holdings declined. To the contrary, Bendaoud is entitled to the contents of his account as they would have been had no breach of duty ever occurred—an amount that could be larger than the small profit he actually made. That relief is cognizable under 29 U.S.C. § 1132(a)(2). Consequently, Bendaoud has standing to seek relief for himself under that section. The Court notes, however, that no defendant will be amenable to suit for authorizing or receiving stock options; Bendaoud must show fiduciary status independent of that corporate act.

In addition, Bendaoud may seek relief "on behalf of the Plan" as that phrase relates to the investments he had, but not as it relates to those held by other Plan participants. As the Supreme Court's decision in *LaRue* highlights, ownership rights in plan assets differ between a defined benefit plan and a defined contribution plan. For a defined contribution plan—like the one at issue here—not all plan participants may suffer an injury in fact when the value of a plan asset is impaired. Similarly, in a defined contribution plan, the harms to each plaintiff are individuated in a way they are not in a defined benefit plan. Bendaoud cannot represent the remainder of the Plan participants without meeting the standards for class representative status.

Generally speaking, the Court agrees with the plaintiffs that it is premature to adjudicate fiduciary status. However, since the plaintiff failed to allege fiduciary status as to defendants Fuller, Johnsen, and McAloon, they must be and hereby are **DISMISSED** as parties.

One final preliminary issue remains undecided: whether Bendaoud has released all of his claims against the defendants. The Court finds the record as it stands insufficient to adjudicate the defendants' claims. Therefore, the Court will exercise its power to obtain jurisdictional discovery and **ORDERS** the following:

(1) The parties shall undertake an abbreviated discovery period related only to the issue of whether Bendaoud knowingly and voluntarily released his claims under ERISA.

(2) The defendants shall submit a summary judgment motion on that issue only, no later than October 30, 2008. The motion shall comply with Fed.R.Civ.P. 56 and Local Rule 56.1. The submission of this motion will not compromise the defendants' ability to seek summary judgment on other issues at an appropriate time.

(3) The plaintiffs shall respond to the motion by November 15, 2008.

For the foregoing reasons, Defendants' Motion for Dismissal Pursuant to Rule 12(b)(1) is **DENIED** (document # 7). Defendants' Motion for Dismissal Pursuant to Rule 12(b)(6) is **DENIED IN PART AND ALLOWED IN PART** (document # 8). Defendants Fuller, Johnsen, and McAloon, are hereby are **DISMISSED** as parties. **SO ORDERED.**