## In re BOSTON SCIENTIFIC CORPORATION ERISA LITIGATION.

### Civil Action No. 06–10105–JLT.

United States District Court,
D. Massachusetts.

Nov. 3, 2008.

her investigation by the content of her complaint or claim, and posed the questions at issue.

Feffer LLP, New York, NY, for Consolidated Plaintiffs.

William H. Paine, Wilmer Hale LLP, Boston, MA, for Consolidated Defendants.

Stuart J. Baskin, Michael T. Rasnick, Shearman & Sterling, Kirsten Nelson, Cunha Shearman & Sterling LLP, John Gueli, Shearman & Sterling LLP, New York, NY, Timothy J. Perla, Monika A. Wirtz, Wilmer Hale LLP, Boston, MA, for Defendants.

Geoffrey M. Johnson, Scott & Scott LLC, Falls, OH, Thomas A. Reed, Holtz & Reed, LLP, Boston, MA, Judith Scolnick, Scott & Scott, New York, NY, David R. Scott, Scott & Scott LLP, Colchester, CT, Eugene J. Sullivan, III, Holtz & Reed, LLP, Boston, MA, for Movants.

## MEMORANDUM

TAURO, District Judge.

### I. *Introduction*

Plaintiffs bring this consolidated putative class action against Boston Scientific and alleged fiduciaries of Boston Scientific's 401(K) Retirement Savings Plan. Plaintiffs assert that Defendants breached their fiduciary duty to the Plan and to participants of the Plan, in violation of ERISA, by imprudently selecting company stock as an investment, despite knowledge that the stock price was artificially inflated. Plaintiffs seek to represent all Plan participants holding Boston Scientific Stock in their individual Plan accounts at any time between May 7, 2004 and January 26, 2006. Presently at issue are (1) Plaintiffs' *Corrected Motion for Class Certification* and (2) Robert Hochstadt's *Motion to Intervene* and be appointed Lead Plaintiff. For the following reasons, both motions are DENIED.

### II. *Background*

#### A. *Facts*

Boston Scientific Corporation ("Boston Scientific") develops, manufactures, and distributes coronary stents, which are medical de-

Samuel K. Rosen, Wechsler Harwood LLP, Leigh Smith, Milberg LLP, New York, NY, for Plaintiffs.

Laurence B. Cote', Boston, MA, Joshua D. Glatter, Jennifer K. Hirsh, Wechsler Harwood LLP, Robert I. Harwood, Harwood

vices used to enlarge blood vessels.[1] Boston Scientific administers a 401(K) Retirement Savings Plan ("the Plan") for the benefit of the company's employees.[2] The Plan qualifies as an "eligible individual account plan" within the meaning of ERISA § 407(d)(3).[3]

Participants in the Plan make voluntary payroll contributions, and the company provides matching contributions.[4] As a "defined contribution" plan, the Plan enables employees to direct the investment of both the voluntary and matching contributions, and to redirect investments or move account balances.[5] During the Class Period, the Plan offered ten different investment options, including Boston Scientific company stock.[6] Plan participants who selected the company stock investment option received a number of units in the Company Stock Fund, whose value depended on the market value of Boston Scientific stock.[7]

Plaintiffs allege that during the Class Period, Boston Scientific issued a series of misleading public disclosures, which had the effect of artificially inflating the value of company stock.[8] Plaintiff further alleges that Boston Scientific continued to offer company stock as an investment option under the Plan throughout this period, even though Defendants should have known that the stock was an imprudent investment.[9]

The first two matters that Defendants purportedly failed to disclose adequately are a Department of Justice investigation concerning Boston Scientific's 1998 recall of its NORS stent system [10] and litigation between Boston Scientific and Medinol Limited, a Boston Scientific supplier.[11] The Department of Justice filed a civil complaint related to the 1998 NORS recall on June 24, 2005, at which point Boston Scientific agreed to pay the government $74 million.[12] Boston Scientific settled the Medinol litigation in September 2005, agreeing to pay the stent supplier $750 million.[13] Plaintiffs allege that Defendants failed to disclose the severity of these matters during the class period, which contributed to an artificially high stock price.

The third subject that Defendants allegedly misrepresented concerns the recall of the company's Taxus stent systems in July and August 2004.[14] From the first SEC disclosure filing after the discovery of the Taxus stents' defective condition on May 7, 2004,[15] until the FDA completed an audit of the stent recall in November 2005, Plaintiffs allege that Boston Scientific continually downplayed the significance of the stents' defect.[16]

Also contributing to the alleged artificial inflation is a series of four FDA warning letters to Boston Scientific between May and August 2005.[17] The FDA warned Boston Scientific that quality control problems and inadequate training of employees posed various regulatory problems.[18] Plaintiffs allege that the company's failure to disclose and correct these problems also pushed company stock to artificially high levels.[19] When the fourth and final warning letter became public on January 26, 2006, the end of the Class Period, Boston Scientific stock immediately dropped from $23.15 to $21.63 and then to

1. Compl. ¶ 15.

2. *Id.* ¶ 49.

3. *Id.*

4. *Id.* ¶¶ 50, 55.

5. Def.'s Mem. Opp'n Mot. Class Cert. 3.

6. *Id.*

7. *Id.*

8. *See, e.g.,* Compl. ¶ 87.

9. *Id.*

10. *Id.* ¶¶ 89–109.

11. *Id.* ¶¶ 110–21.

12. *Id.* ¶¶ 108–09.

13. *Id.* ¶ 21.

14. *Id.* ¶¶ 136–43.

15. *Id.* ¶ 134, 138.

16. *Id.*

17. *Id.* ¶ 147.

18. *Id.* ¶ 147.

19. *Id.* ¶ 147.

$20.09 on January 30, 2006.[20] The company's stock had traded at or near $40.00 per share at the beginning of the Class Period.[21]

### B. *Procedural History*

In January 2006, Douglas Fletcher, Michael Lowe, Jeffrey Klunke, and Robert Hochstadt (collectively "Plaintiffs") filed separate class action complaints against Boston Scientific and various officers of Boston Scientific (collectively "Defendants").[22] All four complaints were consolidated into a single action on April 3, 2006, with all four original Plaintiffs acting as Interim Lead Plaintiffs.[23]

On October 10, 2006, Defendants filed a *Motion to Dismiss,* which was denied in large part on August 28, 2007.[24] In that motion, Defendants argued that Plaintiffs lacked statutory standing to sue on behalf of the Plan because they had already cashed out their Plan accounts and had no reasonable expectation of returning to Boston Scientific.[25] This court held that Plaintiffs nonetheless had statutory standing to sue on behalf of the Plan because Plaintiffs might still be entitled to the difference between what their retirement accounts were worth when Plaintiffs cashed out and what they would have been worth at that time had Defendants not breached their duty.[26] Plaintiffs filed the present *Motion for Class Certification* on March 12, 2008.

On March 28, 2008, Plaintiff Jeffrey Klunke moved to withdraw from the litigation. Klunke had returned to employment with Boston Scientific and stated that he did not "feel comfortable" remaining in the case.[27] He was terminated as a party on April 3, 2008. Plaintiff Robert Hochstadt soon followed suit, moving to withdraw from the litigation on April 7, 2008. Hochstadt was in the process of moving his family after a change of employment and stated that his new responsibilities "preclude[d] him from fulfilling his obligations as class representative."[28] Hochstadt was accordingly terminated as a party to this action on April 29, 2008, leaving Douglas Fletcher and Michael Lowe as the only remaining Interim Lead Plaintiffs. Hochstadt now seeks to reenter the litigation. He filed a *Motion to Intervene* on June 30, 2008 and asks to be reappointed as a class representative.

### III. *Motion to Certify Class*

Plaintiffs now move pursuant to Rule 23 of the Federal Rules of Civil Procedure to certify a class comprised of all participants in the Plan at any time from May 7, 2004 to January 26, 2006.[29] Defendants oppose certification, arguing that Interim Lead Plaintiffs Fletcher and Lowe lack standing and fail to satisfy the requirements of Rule 23(a) and (b).[30] Because this court finds that the putative class representatives lack standing, it need not address Rule 23's certification requirements.[31]

In a class action lawsuit, as in any lawsuit, Article III standing is a "threshold requirement," and the representative plaintiff must demonstrate personal injury in fact to certify a class.[32] Defendants argue that Fletcher and Lowe lack both statutory and constitutional standing. This court previous-

---

**20.** *Id.* ¶ 158.

**21.** *Id.*

**22.** Mot. Class Cert. 2.

**23.** *See* Pretrial Order 3.

**24.** *See In re Boston Scientific Corp. ERISA Litig.,* 506 F.Supp.2d 73, 75 (D.Mass.2007) (dismissing Plaintiffs' ERISA § 502(a)(3) claims, but otherwise denying Defendants' motion).

**25.** *See* Def.'s Mem. Opp'n Mot. Cert. 6.

**26.** *See Boston Scientific,* 506 F.Supp.2d at 75.

**27.** Klunke's Mot. Withdraw 2.

**28.** Hochstadt's Mot. Withdraw 1.

**29.** Pls.' Corrected Mot. Cert. 2.

**30.** *See* Def.'s Opp'n Mot. Cert. 2.

**31.** *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 93–94, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (holding that a federal court may not decide a cause of action before resolving questions of Article III jurisdiction, even if the merits question is more readily resolved and the same party would prevail on the merits).

**32.** *See O'Shea v. Littleton,* 414 U.S. 488, 493, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

ly addressed Plaintiffs' statutory standing to bring this action during the motion to dismiss stage as explained above. Recently, the First Circuit likewise held that former employees who cash out of a defined contribution plan have standing to sue as "participants" under ERISA.[33] The fact, then, that Plaintiffs Fletcher and Lowe are former employees who have cashed out of the Plan does not itself disqualify them from suing on behalf of the Plan.

■ It is not enough to have standing at the initiation of an action, however, because "[s]tanding ... must exist at *all stages* of the proceeding."[34] Crucial to this court's determination that Plaintiffs had standing at the commencement of this case was the allegation that "Defendants' breach of fiduciary duty caused the stock price of Boston Scientific to plummet, *which shrank Plaintiffs' benefits.*"[35] Discovery has since indicated that Plaintiffs Fletcher and Lowe actually gained more money on their company stock Plan investments than they would have made had Defendants' breach never occurred.[36] It becomes necessary in light of such discovery to revisit the question of Plaintiffs' standing.

■ Assuming that Fletcher and Lowe continue to have statutory standing at this stage in the proceedings,[37] "such standing does not necessarily provide constitutional standing."[38] Article III standing requirements must be satisfied even where Congress grants a right to sue.[39] Article III jurisprudence has established three basic elements of constitutional standing: (1) the plaintiff must suffer an injury in fact; (2) that is "fairly traceable" to the defendant's conduct; and (3) redressable by the court.[40] The party invoking federal jurisdiction bears the burden of showing that the elements of Article III standing are present.[41] Plaintiffs in a class action suit must make the same showings of injury in fact, causation, and redressability that are required in every case before an Article III court.[42] Consequently,

**33.** See *Evans v. Akers*, 534 F.3d 65, 67 (1st Cir. 2008).

**34.** *Crawford v. Lamantia*, 34 F.3d 28, 32 (1st Cir.1994) (emphasis in original).

**35.** *In re Boston Scientific Corp.*, 506 F.Supp.2d at 76 (emphasis added). A majority of Circuits has agreed that cashed-out former employees may still qualify as participants with statutory standing. But courts appear to assume universally that those former employees must actually suffer a loss at distribution. See *In re Mut. Funds Inv. Litig.*, 529 F.3d 207, 216 (4th Cir.2008) ("In short, we conclude that participants in defined contribution plans controlled by ERISA have colorable claims against the fiduciaries of their plans *when they allege that their individual accounts in the plans were diminished ....*") (emphasis added); *Lanfear v. Home Depot, Inc.*, 536 F.3d 1217, 1223 (11th Cir.2008) (noting that a cashed-out former employee's claim for benefits is "limited to the difference between the benefits actually received and the benefits that would have been received"); *Graden v. Conexant Sys., Inc.*, 496 F.3d 291, 298 (3d Cir.2007) (emphasizing that it was "clear" that the defendants' breach reduced the value of the plaintiff's distribution); *Harzewski v. Guidant Corp.*, 489 F.3d 799, 807 (7th Cir.2007) (holding that a cashed-out employee has a "claim for benefits measured by the difference between what the retirement account was worth when the employee retired and cashed it out and what it would have been worth then had it not been for the breach of duty").

**36.** See Ross Aff. ¶¶ 15–16, Exs. D & E.

**37.** Because this court finds that Plaintiffs' lack of injury negates constitutional standing, it need not decide whether a plaintiff who benefits from a defendant's breach of fiduciary duty also lacks statutory standing. See *Crawford*, 34 F.3d at 33 (finding no statutory standing where the "plaintiff has failed to show that defendants' alleged breach of fiduciary duty had a direct and inevitable effect on his benefits" even though plaintiff did have statutory standing when the suit was filed); *Caltagirone v. N.Y. Comty. Bancorp, Inc.*, 257 Fed.Appx. 470, 474 (2d Cir.2007) ("Because these plaintiffs cannot show that they suffered any losses as a result of the alleged fiduciary breaches, neither plaintiff has a colorable claim for benefits with statutory standing to sue.").

**38.** *Cent. States Se. and Sw. Areas Health and Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 433 F.3d 181, 199 (2d Cir.2005).

**39.** *Raines v. Byrd*, 521 U.S. 811, 820 n. 3, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997).

**40.** *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

**41.** *Id.* at 561, 112 S.Ct. 2130.

**42.** See *Lewis v. Casey*, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n. 20, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976).

if none of the named plaintiffs has suffered the requisite injury, "none may seek relief on behalf of himself or any other member of the class."[43]

### A. Fletcher and Lowe's Stock Units Purchased During the Class Period

The Supreme Court has made clear in *Dura Pharmaceuticals, Inc. v. Broudo* that, at least in the securities fraud context, the purchase of artificially inflated stock does not perforce result in an injury at the time of purchase.[44] The Court noted that if a purchaser buys artificially inflated shares and then resells them before the relevant truth becomes public, then the misrepresentation concerning the stock causes no injury.[45] Even if the shares are resold at a lower price than they were purchased for, the intervening drop in value is attributable not to the misrepresentation about the stock, but to extrinsic economic circumstances.[46]

While important differences between an ERISA action and an action for securities fraud do exist, the Court's holding in *Dura* applies in both contexts. *Dura* is concerned with the causation element of standing generally and not a "securities specific loss causation."[47] Judge Gertner of this district recently held that if a participant in an ERISA fund both purchases and sells ERISA plan stock during a period of alleged inflation, then the value of the participant's investment in the fund is not harmed by artificial inflation of the stock.[48] As long as the undisclosed information remains nonpublic, the fiduciary's failure to disclose cannot harm the participant's investment.

Fletcher and Lowe both purchased some Boston Scientific stock units while the stock was artificially inflated, but both Plaintiffs sold all of those shares before the period of artificial inflation ended. Fletcher sold all of his Plan units of company stock in September 2004, and Lowe sold his units in November of the same year,[49] both well before the end of the Class Period in January 26, 2006.[50] Unlike *Dura*, however, there is some evidence here that the misleading disclosures were corrected incrementally because some of the damaging information about Boston Scientific became public before the end of the Class Period.

Boston Scientific recalled the Taxus stents in July and August 2004,[51] before either Fletcher or Lowe cashed out. Although Plaintiffs argue that the artificial inflation continued, the announcement of the recall may have affected Boston Scientific stock. Plaintiffs allege that Defendants continued to downplay the extent of the Taxus stents' defective condition throughout the recall period and after Fletcher and Lowe cashed out, so any loss to those shares resulting from the recall alone must be small. Fletcher and Lowe may have suffered some loss with respect to the units purchased during the class period, if those units are considered in isolation.

### B. Net Impact on Fletcher and Lowe's Company Stock Accounts

▬ Plaintiffs argue that it does not matter whether the value of their investment in company stock was harmed by Defendants' conduct. As long as an alternative investment would have outperformed Boston Scientific stock during that period, Plaintiffs

**43.** *O'Shea*, 414 U.S. at 494, 94 S.Ct. 669; *see also Warth v. Seldin*, 422 U.S. 490, 502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F.Supp.2d 172, 193 (D.Mass.2003).

**44.** *See* 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (reasoning that "at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value").

**45.** *Id.*

**46.** *Id.* at 342–43, 125 S.Ct. 1627.

**47.** *See Bendaoud v. Hodgson*, No.06–cv–1873–NG, 578 F.Supp.2d 257, 169–70, 2008 WL 4335884, at *9 (D.Mass. Sept.24, 2008).

**48.** *Id.* at 269–70, 2008 WL 4335884 at *9–10.

**49.** *See* Ross Aff. ¶¶ 15–16, Exs. D & E.

**50.** *See* Compl. ¶ 49.

**51.** Compl. ¶¶ 136–143.

contend that there could still be an injury.[52] There is some force to Plaintiffs' claim. Simply offering misleading information to ERISA Plan participants constitutes a breach of fiduciary duty.[53] Even if the investment makes a profit, participants may suffer an injury if a prudent investment would have turned a greater profit.[54] But participants can only recover if they can show that the value of the investments would have been greater had the fiduciary fulfilled its duty.[55]

■ The principal difficulty for Plaintiffs is that their *overall* investment in company stock units would have generated a *lower* profit had the stock not been artificially inflated during the Class Period. Where a plaintiff's class period sales exceed purchases, the plaintiff has most likely benefitted from any alleged inflation in the stock price for that period.[56] Plan participants who benefit from a fiduciary's breach of duty suffer no injury and have no constitutional standing.[57] If, as Plaintiffs allege, Boston Scientific stock was artificially inflated, then any Plan participants who purchased company stock during the period of inflation overpaid for the stock units and would have a claim to benefits equal to the amount overpaid.[58] A Plan participant who *sold* company stock during that same period, on the other hand, received "too much" for the units and benefitted by the inflation accordingly.[59]

It is undisputed that Plaintiffs Fletcher and Lowe were both "net sellers" during the class period. Fletcher bought 65.47 units and sold 488.58, while Lowe bought 161.41 and sold 5,605.97.[60] Fletcher and Lowe thus sold seven and thirty-four times as many units as they purchased, respectively. This is not a case in which the plaintiffs' investment earnings produced a modest profit that would have been larger but for a breach of fiduciary duty. Plaintiffs necessarily made more money when they cashed out than they would have earned absent Defendants' alleged breach.

If Boston Scientific stock was higher than it "should have been" throughout the class period, then Plaintiffs made a larger profit than they "should have" earned when they cashed in their old shares. Even assuming that the units Fletcher and Lowe purchased during the Class Period were negatively affected by Boston Scientific's failure to disclose, any loss by those shares was more than made up for by the artificially high return on their investment in units purchased before the Class Period began.[61] pur-

---

52. *See Pls.' Reply Supp. Mot. Cert.* 6.

53. *See Bendaoud,* 578 F.Supp.2d at 271–72, 2008 WL 4335884, at *11.

54. *Id.; see also Dardaganis v. Grace Capital, Inc.,* 889 F.2d 1237, 1243 (2d Cir.1989).

55. *Bendaoud,* 578 F.Supp.2d at 271–72, 2008 WL 4335884, at *11.

56. *See In re Organogenesis Sec. Litig.,* 241 F.R.D. 397, 401 (D.Mass.2007) (deeming plaintiff inadequate class representative in securities fraud action because he had sold more shares during the period of alleged artificial inflation than he had purchased).

57. *See Piazza v. EBSCO Indus., Inc.,* 273 F.3d 1341, 1353 (11th Cir.2001) (finding that ERISA plaintiff alleging undervaluation of company stock had no standing because reduction in benefits distributions to participants who retired during period of undervaluation benefitted participants who, like the plaintiff, retired later).

58. Ross Aff. ¶ 13.

59. *Id.*

60. Ross Aff. at ¶¶ 15–16, Exs. D & E. Plaintiff Lowe held 5,445.12 units of company stock when the Class Period began on May 7, 2004. Between May 19, 2004 and August 20, 2004, Lowe purchased 161.41 additional units of company stock. On November 8, 2004, Lowe sold all 5,605.97 units of his company stock. *Id.* Ex. D. Fletcher held 423.00 units at the commencement of the Class Period and purchased 65.47 units between May 19, 2004 and August 11, 2004. Fletcher then cashed in all 488.58 units on November 8, 2004.

61. On November 11, 2004, when Lowe cashed out, the unit price was $23.43. Ross. Aff. Ex. E. At the end of the Class Period, the price of Boston Scientific Stock fund units was $13.92. Ross Aff. ¶ 24. Assuming that the $13.92 amount represents the "true" value of the units throughout the Class Period, the 5,445.12 units Lowe held at the beginning of the Class Period made Lowe $51,783.09 more than they would have made absent the inflation. That number far exceeds even the $4,093.86 Lowe paid for the units he purchased during the Class Period.

chased during the class period, on the whole, Defendants' conduct caused them no personal injury.

## C. *Injury to Plan as a Whole*

Plaintiffs contend that individual injury is not required in an action brought pursuant to § 502(a) of ERISA because such an action is brought on behalf of the Plan as a whole.[62] As long as the Plan suffers an injury, as the argument goes, then any participant in the plan has automatic standing. Plaintiffs rely on *Kuper v. Iovenko*, in which the Sixth Circuit recognized that defendants' breach of duty need not harm every participant in the plan for participants to have standing to sue on behalf of the plan.[63] This court agrees, and so held in denying Defendants' motion to dismiss in this case.[64]

That Defendants' breach need not harm the entire Plan does not mean, however, that Plan participants who were not harmed have standing to represent those who were. "Merely because Plaintiffs claim that they are suing on behalf of the respective ERISA plans does not change the fact that they must establish individual standing."[65] A Plan participant who has not suffered any loss by a breach of fiduciary duty may only bring an ERISA action seeking *prospective* relief.[66] Because Plaintiffs do not seek any injunctive relief in this case,[67] injury to the Plan is not sufficient to grant Plaintiffs individual standing.

Given that Plaintiffs sold substantially more shares than they purchased during the period of inflation, they could only have benefitted from an overvaluation of Boston Scientific stock. Plaintiffs have failed to demonstrate individual injury in fact and therefore lack Article III standing. Accordingly, Plaintiffs' *Motion for Class Certification* is DENIED.

## IV. *Motion to Intervene*

In an attempt to save this Class Action from failing on account of Fletcher and Lowe's lack of injury, former Interim Lead Plaintiff Robert Hochstadt ("Hochstadt") moves to intervene and be appointed as a class representative. Hochstadt cashed out his Plan account on June 30, 2007, well after the January 26, 2006 close of the Class Period.[68] Hochstadt's Plan account holdings in Boston Scientific stock units reportedly dropped from $457,487 to $187,753 as a result of Defendants' breach.[69] Unlike Fletcher and Lowe, it appears that Hochstadt would thus have standing to represent the Plan.

### A. *Additional Background*

The parties offer markedly different characterizations of the circumstances leading to Hochstadt's initial withdrawal from the case. Plaintiffs maintain that Hochstadt was unable to participate in the case because he started a new job and moved his family to a new state soon before the "small time window allowed by defendants" for depositions.[70] Plaintiffs assert that it was Defendants' re-

62. *See, e.g.,* Pl.'s Reply Supp. Mot. Class Cert. 4.

63. *See Kuper v. Iovenko,* 66 F.3d 1447, 1452 (6th Cir.1995).

64. *See In re Boston Scientific,* 506 F.Supp.2d 73, 76 (D.Mass.2007) (holding Plaintiffs did not lack standing merely because they sought recovery for only a subsection of the plan).

65. *Loren v. Blue Cross & Blue Shield of Mich.,* 505 F.3d 598, 608 (6th Cir.2007); *see also Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS, Inc.,* 465 F.3d 1123, 1127 (9th Cir. 2006) (similarly holding that only plaintiffs who suffer individual injury have standing to bring ERISA class action in representative capacity); *Cent. States,* 433 F.3d at 200 (same); *Harley v. Minn. Mining and Mfg. Co.,* 284 F.3d 901, 906–07 (8th Cir.2002) (same).

66. *See, e.g., Horvath v. Keystone Health Plan E., Inc.,* 333 F.3d 450, 456–57 (3d Cir.2003) (holding that statutory standing is enough to seek injunctive relief under ERISA, but requiring plaintiffs to demonstrate individual loss in claims for disgorgement and restitution).

67. *See In re Boston Scientific,* 506 F.Supp.2d at 76 (finding that Plaintiffs have no claim for equitable relief in this case).

68. Hochstadt's Mem. Supp. Mot. Intervene 2.

69. *Id.*

70. Hochstadt Mem. Supp. Mot. Intervene 1.

fusal to accommodate Hochstadt's schedule that "forced" him to withdraw.[71]

Defendants counter that it was Plaintiffs' counsel who had requested to hold depositions the last two weeks before the agreed-upon deadline for depositions.[72] Apparently, Hochstadt later informed Defendants that he was not available for the second week, leaving only one week in which Defendants could depose him.[73] Plaintiffs also asked Defendants to conduct depositions in Plaintiffs' home states of Florida, Minnesota, and Wisconsin.[74] Defendants protested that depositions should be taken in Massachusetts, where Plaintiffs filed the action, or in New York, where Plaintiffs' counsel was located.[75]

When Hochstadt stated that he was unavailable to make the one-day trip from his home state of Florida to New York because he could not take time away from his new job, Defendants asked Hochstadt to provide an affidavit explaining why then he was available for a deposition during business hours in Tampa.[76] Plaintiffs' counsel apparently agreed to provide an affidavit and informed Defendants that they would move for an extension or alternative arrangements if the parties could not agree.[77] Defendants claim that they had inquired about the affidavit

twice without a meaningful response before Hochstadt suddenly withdrew from the case a week before the deposition deadline without explanation.[78] As evidence that Defendants were willing to cooperate if Hochstadt had explained his situation, Defendants point out that Plaintiff Fletcher was deposed in Minnesota after he proved unable to travel to New York or Boston.[79]

## B. *Analysis*

There are two types of intervention under the Federal Rules of Civil Procedure, both of which are sought by Hochstadt: (1) "as of right" intervention;[80] and (2) "permissive intervention."[81] For both forms of intervention, timeliness is "of first importance."[82] The First Circuit has adopted four factors to consider in determining the timeliness of a motion to intervene: (1) the length of time the applicant knew or should have known of his interest before moving to intervene; (2) prejudice to existing parties due to the applicant's delay; (3) prejudice to the applicant if intervention is denied; and (4) any "unusual circumstances militating for or against intervention."[83]

---

71. *Id.* 4.

72. Def. Mem. Opp'n Mot. Intervene 3.

73. *Id.*

74. *Id.*

75. *Id.*

76. *Id.*

77. *Id.* 4.

78. *Id.*

79. *Id.*

80. *See* Fed. R. Civ. Pro. 24(a).

81. *Id.* 24(b).

82. *Caterino v. Barry*, 922 F.2d 37, 40 (1st Cir. 1990). A court must grant intervention as of right if the applicant satisfies all of the following requirements: (1) the application is timely; (2) the applicant has a "direct and substantial interest" in the litigation; (3) the applicant is "so situated that the disposition of the action may as a practical matter impair or impede its ability to

protect that interest"; and (4) the applicant's interest is inadequately represented by the existing parties. *Id.* at 39–40. There is no question that Hochstadt, as a class member, has a direct interest in this litigation. The interest is clearly not represented by existing parties because the two remaining Plaintiffs have no standing to represent the class. Whether Hochstadt is entitled to intervention as of right thus hinges on whether his application is timely and whether he will be able to protect that interest effectively if not allowed to intervene.

Under the standard for permissive intervention, a court may allow intervention if the application is timely and the applicant's claim has a question of law or fact in common with the main action. Fed. R. Civ. Pro. 24(b). Permissive intervention is "wholly discretionary," and a court should consider whether intervention will prejudice the existing parties or delay the action. *In re Sonus Networks, Inc. Sec. Litig.*, 229 F.R.D. 339, 345 (D.Mass.2005). Because the question of timeliness and prejudice are identical for both forms of intervention, they will be discussed together.

83. *Caterino*, 922 F.2d at 40; *see also Culbreath v. Dukakis*, 630 F.2d 15, 20–24 (1st Cir.1980).

**34**

### 1. Length of Time

 Whether Hochstadt waited too long before seeking to represent his interest in the litigation depends on what exactly the intervenor must know before the clock starts ticking. Hochstadt asks this court to consider only the time that has passed since he first learned that "his re-entry into the case might be necessary to protect the class," which Hochstadt claims to have discovered when Defendants questioned Fletcher and Lowe's standing in their opposition to class certification.[84] Hochstadt moved for intervention only five weeks later.[85]

 But timeliness turns on when the applicant first learned that he had any interest in the case, not when the applicant decides he might be needed.[86] A class member who is aware of a class action affecting his interests "act[s] at his peril in not seeking to become a lead plaintiff and class representative."[87] Hochstadt knew that he had an interest in this litigation when he filed his own class action complaint in January 2006. When he voluntarily withdrew from the litigation in April 2008, he relinquished some of his ability to control his rights in this case, but did not thereby become ignorant to his affected interests. Hochstadt knew of his interests in this case for approximately two and a half years before moving to intervene, not the five weeks since it occurred to him that certification might be denied.

### 2. Prejudice to Existing Parties

Hochstadt argues that Defendants would suffer minimal prejudice because his intervention would simply require them to take one deposition that they had already planned on taking when discovery began. What Hochstadt misses is the significant expenses already incurred by Defendants in preparing their opposition to Plaintiffs' motion to certify, including retention of an expert. Relying on Hochstadt's withdrawal, Defendants devoted much of their opposition to explaining why Fletcher and Lowe's status as net sellers makes them improper representatives in this class action. Those efforts would be rendered entirely superfluous if Hochstadt, who *has* suffered an injury, were permitted to re-enter the litigation. It would be unfair to allow Hochstadt to intervene after Defendants tailored their briefing efforts to the shortcomings of the remaining lead plaintiffs on the reasonable assumption that Hochstadt no longer sought to represent the class.[88]

### 3. Prejudice to Hochstadt

Hochstadt claims that he and the entire class would suffer "absolute" prejudice if the motion to intervene is denied.[89] But a class member's interests in a class action suit are not left unprotected if certification is denied, because he can still file a class action on his own behalf or on behalf of a class.[90] Plaintiffs' counsel have undoubtedly incurred significant expenses in this litigation, which will be lost if certification is denied.[91] As Judge Wolf of this District has pointed out in a similar case, however, prejudice to counsel is "not a cognizable Rule 23 concern."[92] Hochstadt and members of the proposed class who suffered economic loss as a result of Defendants' alleged artificial inflation of company stock are free to file another action against Defendants. Denying intervention

**84.** *See* Hochstadt's Mem. Supp. Mot. Intervene 8.

**85.** *Id.*

**86.** *See Caterino*, 922 F.2d at 40 (finding motion to intervene untimely where applicants filed the motion a matter weeks after learning that their interests might be negatively impacted because the applicants had notice three years earlier that the case might affect their interests).

**87.** *In re Sonus*, 229 F.R.D. at 346; *see also Narragansett Indian Tribe v. Ribo, Inc.*, 868 F.2d 5, 7 (1st Cir.1989) ("Parties having knowledge of the pendency of litigation which may affect their interest sit idle at their peril.").

**88.** *Id.* at 346.

**89.** Hochstadt's Mem. Supp. Mot. Intervene 9.

**90.** *See In re Sonus*, 229 F.R.D. at 346 (noting that the commencement of a class action suspends the statute of limitations).

**91.** *In re Sonus*, 229 F.R.D. at 344.

**92.** *Id.* In *In re Sonus*, a class member sought to intervene and be appointed class representative after the sole class representative withdrew amidst concerns that past drug convictions rendered him an inadequate representative. *Id.*

does not harm them to the extent argued by Hochstadt.

### 4. *Unusual Circumstances*

Most importantly, unusual circumstances in this case militate against permitting intervention. Hochstadt had the opportunity to control his own destiny as Interim Lead Plaintiff in this case, but he voluntarily relinquished that role. Plaintiffs now complain that Defendants forced Hochstadt out of the case unfairly, but at the time, Hochstadt represented to this court that he no longer felt able to "fulfill[ ] his obligations as class representative." Hochstadt has never explained why he failed to provide Defendants an affidavit clarifying why he could not take time from work to attend a deposition in New York if he was available during business hours in Florida. That Defendants subsequently deposed another Plaintiff in Minneapolis suggests that Defendants may have accommodated Hochstadt's schedule as well if he had explained himself.

It would be unfair to Defendants to permit Hochstadt to duck in and out of the case at his convenience. Plaintiffs should have foreseen that Fletcher and Lowe potentially posed problems of standing that Hochstadt did not present. If Hochstadt's professional and family circumstances made it momentarily difficult for him to attend an out-of-state deposition, then he and Plaintiffs' counsel should have made a greater effort to work out a solution with Defendants. If Hochstadt's difficulty participating in the action is more permanent, then he is probably not the most appropriate class representative in any event. The fact that Hochstadt did not make a great effort to participate in the litigation when he had the opportunity thus militates against intervention now that his presence seems more urgent.

All of the timeliness factors favor Defendants. Hochstadt has known about his interests since at least the beginning of 2006, but voluntarily withdrew from the case. If he desires to pursue his rights further, he may file another action individually or on behalf of a class. Hochstadt's *Motion to Intervene* is DENIED.

### IV. *Conclusion*

For the foregoing reasons, Plaintiffs' *Motion to Certify Class* and Robert Hochstadt's *Motion to Intervene* are DENIED.

AN ORDER HAS ISSUED.

### ORDER

For the reasons in the accompanying Memorandum, this court hereby orders that:

1. Plaintiff's *Corrected Motion for Class Certification* [# 66] is DENIED.

2. Robert Hochstadt's *Motion to Intervene* [# 80] is DENIED.

3. This case is DISMISSED for Plaintiffs' lack of Article III standing.

IT IS SO ORDERED.