# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2524

_____

| | | |
|---|---|---|
| Mark Brown, on behalf of himself and a class of persons similarly situated, | * * * | |
| Plaintiff - Appellant, | * * | |
| Christine Wright; Kathy Breiwick, | * * | |
| Movants, | * * | |
| v. | * * * | Appeal from the United States District Court for the District of Minnesota. |
| Medtronic, Inc.; Carol A. McCormick; The Qualified Plan Committee of Medtronic, Inc.; The Medtronic, Inc. Board of Directors Compensation Committee; Richard H. Anderson; Victor J. Dzau; James T. Lenehan; Kendall J. Powell; Jack W. Schuler; The Medtronic, Inc. Board of Directors; David L. Calhoun; Arthur D. Collins, Jr.; William A. Hawkins; Shirley Ann Jackson; Denise M. O'Leary; Robert C. Pozen; Jean-Pierre Rosso; Gary Ellis; Terry Carlson; Warren Watson; Dave Ness; Katie Szyman; Gary Lubben, | * * * * * * * * * * * * * * * * | |
| Defendants - Appellees. | * | |

_____

Submitted: May 12, 2010
Filed: December 13, 2010

_____

Before BYE, MELLOY, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

Plaintiff Mark Brown appeals the district court's dismissal of his complaint against Medtronic, Inc., several of its directors, a retirement plan committee, and various fiduciaries. Brown alleges class-action claims pursuant to the Employee Retirement and Income Security Act of 1973 ("ERISA") and seeks to serve as the representative plaintiff. His claims relate to purported breaches of fiduciary duties associated with information disclosures or non-disclosures surrounding two Medtronic products: Infuse-brand bone graft material ("Infuse") and Sprint Fidelis-brand lead wires for implantable defribillators and pacemakers ("Fidelis"). Brown alleges generally that Medtronic stock became an imprudent investment after the defendants obtained certain adverse information regarding performance of Fidelis and business practices surrounding Infuse. He alleges specifically that the defendants breached fiduciary duties by failing to adequately disclose the information, making a disclosure that deceptively downplayed the information, and imprudently continuing to invest in Medtronic stock after receipt of the adverse information.

The district court held Brown lacked constitutional standing. We affirm the judgment of the district court, albeit on slightly different grounds. We hold Brown lacks constitutional standing to bring Infuse-related claims, possesses standing to bring Fidelis-related claims, but, ultimately, fails to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

I.    Background

Medtronic manufactures and markets a broad assortment of medical devices through several different business units. Infuse and Fidelis are two of Medtronic's many products. Regarding Infuse, Brown alleges Medtronic promoted Infuse for uses not approved by the FDA and improperly paid reviewing physicians for favorable reviews. Brown alleges information regarding these Infuse-related actions came to light through a September 4, 2008 Wall Street Journal article. He alleges Medtronic stock price dropped following publication of the article because the price had been artificially inflated due to the previously undisclosed actions. He also alleges the present defendants breached their fiduciary duties at an earlier time by participating in, or turning a blind eye towards, these activities and continuing to invest in Medtronic stock. Although he alleges defendants knew of the alleged actions prior to publication of the Wall Street Journal article, he does not allege that any issues surrounding Infuse caused Medtronic stock price to drop prior to September 2008.

Regarding Fidelis, Brown alleges that the defendants failed to respond properly to a February 2007 report from a physician, Dr. Hauser, who observed an approximate 1% failure rate in Fidelis leads among approximately 600 patients. Dr. Hauser reported his concerns to Medtronic personnel, including a vice president, in February 2007. Dr. Hauser then published his concerns in a medical journal in March 2007. In April 2007, Medtronic issued a "Dear Doctor" letter relaying Dr. Hauser's concerns and discussing Medtronic's investigation into the concerns. In the letter, Medtronic suggested physician error in implantation might be partially responsible for some failures and suggested techniques to minimize failures. Medtronic subsequently collected data from approximately 25,000 patients. In October 2007, Medtronic stopped marketing Fidelis, issued a recall of non-implanted devices, and instructed physicians to cease new uses of Fidelis.

Medtronic stock price had climbed to about $57 per share prior to the October 2007 Fidelis recall and dropped by 10-12% shortly after the recall to around $50–51 per share. Brown alleges Medtronic failed to react appropriately to Dr. Hauser's February report and attempted to cover up a product defect by issuing the Dear Doctor letter suggesting physician error was partially to blame. He also alleges it was imprudent to wait until October to recall Fidelis.

Brown does not allege company stock was an imprudent investment prior to February 2007. Also, he admits that some degree of stock-price drop likely would have occurred even if Medtronic had immediately made a public disclosure of Dr. Hauser's report or immediately taken more dramatic corrective action. Brown's counsel made clear in arguments to the district court, however, that Brown alleges more than merely a stock price drop due to decreased earning expectations associated with the negative Fidelis information. Brown alleges that the broader market perceived Medtronic's eventual response as delayed and as a cover-up and that the market essentially punished Medtronic by devaluing its stock through the application of a "liar's discount." Accordingly, Brown alleges the stock price drop that occurred in October 2007 was due in part to the adverse product data and recall but also in part to this alleged "liar's discount" or general loss of faith in Medtronic's veracity and goodwill.

Medtronic's stock price, like the broader market, subsequently fluctuated in ensuing months. In Fall 2008, like the broader market, Medtronic stock temporarily dropped in value by about 40%.

Medtronic employed Brown from 1974 through May 2008. During this time Brown participated in an employee stock ownership plan ("ESOP"). On February 15, 2007, the date Brown proposes as the beginning of the class period, Brown held approximately 2000 units of a plan fund that invested almost exclusively in Medtronic

common stock.[1]  The closing price on February 15, 2007 was slightly over $54.  After February 15, 2007, and until his separation from Medtronic in Spring 2008, Brown continued to purchase shares, acquiring 324 additional shares.  He alleges that the average price he paid for these additional shares was slightly less than $51 per share. Brown does not indicate the exact dates of his purchases, and therefore, it is not clear how many shares he purchased before and after the various events he alleges to be material to his claims.  Brown liquidated his shares in transactions in May and June 2008.  He sold the majority of his shares for slightly less than $50 per share and a small minority of his shares for about $51 per share.

Brown brings five claims.  Claims 1 and 4 allege breaches of fiduciary duties through imprudent ESOP investment in Medtronic stock.  Claim 2 alleges breaches of fiduciary duties through material misrepresentations and nondisclosures.  Claims 3 and 5 are derivative of the other claims with Claim 3 alleging "divided loyalties" by fiduciaries and Claim 5 alleging corporate fiduciaries failed to properly appoint, monitor, and inform members of the retirement plan committee.[2]  The district court looked at the dates of share-price changes and the dates of Brown's purchases and sales of shares and determined that Brown was a net beneficiary of any artificial price inflation caused by the defendants' actions or failures to act.  Accordingly, the district court held Brown lacked standing because he suffered no constitutionally cognizable injury fairly traceable to any of the defendants' alleged breaches of duty.  In so holding, the district court appears to have focused on the overall 40% share price drop that occurred in Fall 2008.  Brown appeals.

---

[1]The fund held Medtronic common stock and a small amount of cash to enable transactions.  Although Brown technically held fund "units," we refer to Medtronic stock or shares in our opinion because the value of fund "units" were at no time materially distinct from the value of shares of Medtronic common stock.

[2]Given our disposition of this case, we need not address whether any particular defendants are properly named defendants for these types of claims nor need we address questions of statutory standing.

II.     Discussion

        A.      Standing

                1.      General Requirements

        "Th[e] irreducible constitutional minimum of standing requires a showing of injury in fact to the plaintiff that is fairly traceable to the challenged action of the defendant, and likely to be redressed by a favorable decision." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 591 (8th Cir. 2009) (internal quotations and alteration omitted). Federal courts must address questions of standing before addressing the merits of a case where standing is called into question. Steel Co. v. Citizens for a Better Env., 523 U.S. 83, 93–102 (1998). Here, the parties disagree as to the analytical framework that should apply to determine the presence of an injury. Our Court has not addressed this question in the context of the present types of ERISA claims. Although we do not suggest there is only one means by which a defendant might demonstrate an injury in this context, we agree with the district court that, at a minimum, a plaintiff must allege a net loss in investment value that is fairly traceable to the defendants' challenged actions. For the purpose of our analysis, we interpret Brown's claims as alleging two distinct injuries: Fidelis-related injuries and Infuse-related injuries.[3]

---

        [3]Brown articulates his five claims in terms of the specific duties alleged to have been breached. As to each claim, he appears to allege artificial share price inflation caused by both Infuse-related actions and Fidelis-related actions. Medtronic argues we may not separate these two categories of alleged injuries for our analysis of standing because according to Medtronic, Brown strictly pled the injuries as a composite harm rather than as individual harms. We reject Medtronic's reading of the complaint for two reasons. First, it presumes a degree of precision in the drafting of Brown's complaint that simply is not visible on the face of the complaint. Second, we do not believe our standing analysis—the court's own review for the purpose of ensuring jurisdiction—turns on a purported drafting technicality in the manner urged

The district court applied a "net loss" theory of injury as described in <u>In re: Boston Scientific Corp. ERISA Litigation</u>, 254 F.R.D. 24 (D. Mass. Nov. 3, 2008). <u>Boston Scientific</u>, in turn, applied an analysis from <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336 (2005). <u>Boston Scientific</u> teaches that, where an ERISA plan participant complains of a breach of fiduciary duty in the form of actions that artificially inflated share price, the participant has suffered no cognizable injury if the participant sold shares at an inflated price and, therefore, was a net beneficiary of the inflated share price. <u>Boston Scientific</u>, 254 F.R.D. at 31. The Supreme Court in <u>Dura</u> set forth this same concept when analyzing causation in the context of a securities-fraud case, finding no "loss" where a party sold shares at an allegedly artificially inflated price. <u>Dura</u>, 544 U.S. at 342.

The Court in <u>Dura</u> did not face a question of ERISA fiduciary duties. Regardless, the Court pronounced a rule that it described as "pure logic." <u>Dura</u>, 544 U.S. at 342. Presumably any such rule founded on basic concepts of loss and injury and characterized as "pure logic" should find broad application in ERISA, securities law, and other contexts where plaintiffs describe their injuries in terms of stock price changes. Brown argues against the application of <u>Boston Scientific</u> and <u>Dura</u>, pointing to what he characterizes as out-of-pocket losses and arguing simply that, because he sold stock for less than it was worth at the start of the proposed class period, he has suffered a sufficient injury to create standing. The Court in <u>Dura</u> rejected this simplistic view, stating:

> For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if,

_____

by Medtronic.

say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. (The same is true in respect to a claim that a share's higher price is lower than it would otherwise have been-a claim we do not consider here.) Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.*, the more likely that other factors caused the loss.

Id. at 342–43. The district court and the court in Boston Scientific applied this logic and determined that it is necessary for a plaintiff to identify more than merely a stock price drop throughout a proposed class period to articulate an injury for the purpose of establishing standing.

In fact, Brown does not present meaningful arguments to refute the statement of "pure logic" from Dura. Instead, Brown cites a district court case that rejected Boston Scientific and criticized Boston Scientific for "conflat[ing] the threshold standing inquiry with a determination of the merits of the plaintiff's claim at the motion to dismiss stage." Almonor v. Bankatlantic Bancorp, Inc., No. 07-61862, slip op. at *11 (S.D. Fla. July 14, 2009) (provided as an addendum in the appellant's brief). The court in Almonor held that financial "damages" were not a component of the standing inquiry in an ERISA breach of fiduciary duty case and that the abstract violation of a fiduciary duty in and of itself was injury sufficient to confer standing. Id. at *10–11.

We agree with Almonor only in part. We agree that is important not to conflate the injury and traceability requirements of a standing analysis with the plaintiff's

ultimate burden of proof as to the issues of damages and causation at a trial on the merits. See Braden, 588 F.3d at 591 ("In most cases . . . a plaintiff's standing tracks his cause of action. That is, the question whether he has a cognizable injury sufficient to confer standing is closely bound up with the question of whether and how the law will grant him relief. It is crucial, however, not to conflate Article III's requirement of injury in fact with a plaintiff's potential causes of action, for the concepts are not coextensive.") (internal citations omitted).

We do not, however, agree that in the present context a purported "abstract violation" of a fiduciary duty is sufficient to create standing for all persons to whom the duty is owed. Such a position fails to account for the third requirement of standing: redressability. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Neither the court in Almonor nor Brown in his arguments discuss how an ERISA fiduciary's breach could be redressed by our court in the event the breach actually conferred a financial benefit on a plan participant who has already liquidated his shares and has no ongoing financial stake in the plan or the company. We have rejected such "abstract injury" theories in the context of different types of ERISA claims. See, e.g., Schulz v. Windstream Commc'ns, Inc., 600 F.3d 948, 952 (8th Cir. 2010) ("The Amendment did not alter the pension benefits owed to [Appellants]. Therefore, even if this court invalidated the Amendment . . ., these Appellants would still receive benefits . . . . They have no standing to challenge how it was adopted because how it was adopted does not affect them."); McCullough v. AEGON USA, Inc., 585 F.3d 1082, 1085 (8th Cir. 2009) (finding a lack of standing to assert an ERISA breach-of-fiduciary-duty claim where, although there may have been an abstract breach of duty, the defined-benefit plan at issue in the case was at all relevant times substantially overfunded). In essence, if applied in the present circumstances as urged by Brown, Almonor would eliminate the redressabilty requirement or, at a minimum, decouple the concepts of injury and redressability. As already noted, we share Almonor's generalized concern that limited inquiries for analyzing standing not be confused with a requirement for full proof of causation or a detailed assessment of

damages. Still, there must exist some measure of redressability as related to the alleged injury to prevent a federal court's opinion from being purely advisory.

Brown further argues against the loss theory of <u>Boston Scientific</u> and <u>Dura</u> by offering two alternative theories. As already noted, he proposes a theory that would look only at out-of-pocket losses without reference to the timing of information disclosures. He also argues he may establish an actionable injury based on the foregone earnings from some alternative, better-performing investment.

In Brown's out-of-pocket loss theory, he asserts merely that, when he sold his plan units, they were worth less per unit than they were at the beginning of the proposed class period. According to Brown, this alone is sufficient to establish standing. Such a theory, however, could only establish a constitutional injury if a reviewing court also required a colorable claim of causation to establish that any such alleged out-of-pocket loss be "fairly traceable" to the challenged action. <u>Braden</u>, 588 F.3d at 591. Brown's articulation of an out-of-pocket loss theory omits this element of standing and amounts to little more than a request for the court to focus solely on the alleged loss without reference to its cause.

Such a theory of loss ignores the practical reality of the market. Investors or participants who sell before allegedly concealed, adverse information impacts price may ultimately earn or lose money on their transaction. If their sale price captures the alleged artificial price inflation (if it does not reflect the discount alleged to be caused by the disclosure of previously concealed information), the participant's out-of-pocket losses cannot be viewed as "fairly traceable" to the allegedly wrongful concealment. Such investors may, of course, have some out-of-pocket losses, but, as the Court noted in <u>Dura</u>, gains or losses on particular sales could be caused by endless different market factors. 544 U.S. at 342–43. We therefore reject Brown's proposed out-of-pocket theory as failing to account for all three requirements for standing.

The other of his two arguments, the alternative-investment theory, is essentially an opportunity-cost argument without a fair-traceability component. Brown cites Donovan v. Bierwirth, 754 F.2d 1049, 1053 (2d Cir. 1985), for the purported proposition that if, in hindsight, a different investment alternative would have generated better returns, the existence of this foregone higher return is in and of itself sufficient "injury" to grant standing. This appears to be a misreading of Donovan. The court in Donovan did not address a question of standing. Rather, it addressed a question of damages and looked at harm to the plaintiff in a more in-depth fashion than may be appropriate for a preliminary, standing analysis. Further, Donovan did not involve allegations that an improper withholding of information had affected share price. See id. For such cases—cases involving withheld information—the Second Circuit in Donovan expressly noted that the appropriate measure of damages would be the difference between the investment as taken and the investment as it would have been if not tainted by withheld information. Id. This difference, in our view, is precisely the type of injury described by Boston Scientific and Dura. Where a plaintiff actually shows a fairly traceable and redressable loss, the performance of possible alternative investments may comprise an element of a subsequent damages analysis. The presence of such alternative investments, however, does not show how any alleged injury in this case is traceable to the defendants' actions.

2.    Infuse or Fidelis-Related Injuries

Applying Dura in the context of an ERISA action as per Boston Scientific, we find no injury fairly traceable to any of the alleged breaches of duty related to Infuse. By Brown's own allegations, negative information regarding Infuse-related business practices did not reach the public until September 2008, months after he had completely liquidated his ESOP account. Accordingly, in his sales, Brown had to have realized any share price inflation caused by the allegedly improper promotion of Infuse. The exact timing of the alleged deceptive practices surrounding Infuse is not clear. Even if we were to assume, however, that Brown paid an inflated price for

some of the 2000 shares he held at the beginning of the proposed class period (and all of his subsequently purchased shares), he suffered no loss traceable to the alleged improper practices because he sold his shares before any public disclosures regarding Infuse and at prices that had to have reflected the purported artificial inflation. As described by the Court in Dura, such a scenario presents no constitutional injury.

Regarding the Fidelis product, more careful examination is required. In arguing that Brown lacked constitutional standing, Medtronic urges us to look at the entire case at a generalized level. Medtronic argues that, because Brown sold all of his shares in Spring 2008, prior to the one most dramatic drop in share price that occurred in Fall 2008, Brown's sale price reflected the purported artificial price inflation, and he therefore suffered no injury. Medtronic characterizes Brown as a net seller who received a net benefit throughout the proposed class period.

This highly generalized analysis is inappropriate in the context of the Fidelis-related allegations. Brown clearly alleged that a share price drop of 10-12% in Fall 2007 was fairly traceable to Medtronic's product recall and the company's broad acknowledgment of adverse data. Brown alleges that at least part of this price decline was due to the market's purported realization that Medtronic may have been concealing negative information prior to the recall.

Brown held shares at the time of the disclosure and the 10-12% price decline, and he sold his shares many months later in May and June 2008. Although he sold his shares prior to Fall 2008 when Medtronic shares (and the broader market) suffered more dramatic declines, his sale prices arguably reflected his alleged, continued devaluation of 10-12% relative to the pre-recall share price. As per Dura, the strength of the causal inference lessens with the passage of time between the date of a disclosure-related price drop and a plaintiff's actual sale of shares. Dura, 544 U.S. at 343. Here, however, we are neither analyzing damages nor requiring a plaintiff to prove proximate cause. For present purposes, we ask only whether Brown has alleged

-12-

an injury that is fairly traceable to the allegedly wrongful act. Braden, 588 F.3d at 591. Given the actual October 2007 share-price drop, the timing of Brown's sales in May and June 2008, and the allegation that the drop was at least in part due to the market's response to the alleged wrongdoing, we conclude Brown has articulated a traceable and redressable injury sufficient to show standing. We make no comment on the sufficiency of such allegations to prove damages or establish causation in other contexts in any similar or subsequent case.

### B. Failure to State a Claim

The standing inquiry is merely a threshold inquiry. Federal Rules of Civil Procedure 8(a) & 12(b)(6) as interpreted in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), present higher hurdles. Similarly, as to Brown's misrepresentation claims, Rule 9(b) sets its own heightened bar. Although we conclude Brown has standing to present Fidelis-related claims, we easily conclude his claims cannot survive Medtronic's motion to dismiss pursuant to Rule 12(b)(6).

Twombly requires a plaintiff to plead facts sufficient to "raise a right to relief above the speculative level." 550 U.S. at 555. While the pleadings need not show relief is probable, they must show the plaintiff's claims are "plausible." Id. at 556; Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. Courts must accept a plaintiff's specific factual allegations as true but are not required to accept a plaintiff's legal conclusions. Twombly, 550 U.S. at 556. Further, documents attached to or incorporated within a complaint are considered part of the pleadings, and courts may look at such documents "for all purposes," Fed. R. Civ. P. 10(c), including to determine whether a plaintiff has stated a plausible claim, see M.M. Silta v. Cleveland Cliffs, Inc., 616 F.3d 872, 876 (8th Cir. 2010) (reviewing the language of a contract included with the pleadings to gauge the sufficiency of a

complaint); Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc., 406 F.3d 1052, 1063 n.3 (8th Cir. 2005).

In Claims 1 and 4, the imprudent investment claims, Brown alleges generally that Medtronic stock became an imprudent investment when Dr. Hauser revealed his concerns to the company. Medtronic urges our court to adopt the presumption described in Moench v. Robertson, 62 F.3d 553, 571 (3d Cir. 1995), for ESOPs, namely, that investments in company stock are entitled to a rebuttable presumption of prudence because the ESOP goal of employee stock ownership cannot always be reconciled with an ERISA fiduciary's duty to invest prudently in a diversified pool of assets. Medtronic argues that this presumption applies and that it shields fiduciaries from liability for investing in company stock unless the fiduciaries possessed information tending to show the company's financial situation was so dire that the continued existence of the company was in question. Id. at 572 (describing a situation possibly sufficient to overcome the presumption as involving a "precipitous decline in the price of . . . stock [and] the Committee's knowledge of its impending collapse.")

Our circuit has not yet adopted the Moench presumption, although several other circuits have. See Quan v. Computer Sciences Corp.,623 F.3d 870, 881 (9th Cir. Sept. 30, 2010); Kirschbaum v. Reliant Energy, Inc., 526 F.3d 243, 253 (5th Cir. 2008); Kuper v. Iovenko, 66 F.3d 1447, 1459 (6th Cir. 1995). We are unable to identify any circuit that has expressly rejected the presumption on its merits, although more than one court has declined to adopt the presumption where the presumption was unnecessary to resolve the matters at hand or simply inapplicable to the precise issue before a court. See, e.g., Bunch v. W.R. Grace & Co., 555 F.3d 1, 10 (1st Cir. 2009). Further, we believe the strength of the presumption is unclear, and the presumption, even if adopted, need not be interpreted to be as protective of fiduciaries as asserted by Medtronic. The presumption, however strong, recognizes that Congress specifically sought to preserve and encourage systems for employee stock ownership that would give employees vested interests in the health and success of their

employers.  See Moench, 62 F.3d at 568 ("ESOPS were described as devices for expanding the national capital base among employees—an effective merger of the roles of capitalist and worker.") (internal citation and quotations omitted).

Today we need not reach the question of whether our circuit should adopt the presumption.  Looking only at Brown's Fidelis-related allegations, he simply has alleged no plausible claim that Medtronic stock became an imprudent investment due to Dr. Hauser's report or due to the company's actions following receipt of the report.  We reach this conclusion even in the absence of the Moench presumption.  Brown's claim, ultimately, reduces to an allegation that the failure to respond more quickly, openly, or dramatically to Dr. Hauser's report sufficiently impacted Medtronic's corporate well being that company stock became an imprudent investment.  Brown does not allege imprudence prior to the company's receipt of Dr. Hauser's report, and it is undisputed that Dr. Hauser himself published his results shortly after disclosing his concerns to Medtronic.  Brown's argument, then, relies heavily on his allegation that Medtronic's "Dear Doctor" letter was perceived by the market as an attempt to whitewash a known problem and deflect responsibility for any failures away from the company and towards physicians and their surgical procedures.

Here, the Dear Doctor letter itself is a part of the complaint, and, as such, we may examine the letter to determine if Brown has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949.  As we already described in a separate securities action, we do not view Brown's characterization of the letter as a nefarious document to be reasonable:

> It is difficult to see how a letter disclosing a possible problem and an investigation into that problem was materially misleading.  The letter refers to the ongoing investigation, couches the information contained in the letter itself as preliminary, and states the early investigation

-15-

"suggests" that implant procedures "may" contribute significantly to the fracture reports.

Detroit Gen. Ret. Sys. v. Medtronic, Inc., 621 F.3d 800, 806 (8th Cir. Sept. 16, 2010). Accordingly, we do not view the letter as plausibly supporting an inference that Medtronic made misrepresentations or acted imprudently in responding to Dr. Hauser's letter or that the committee acted imprudently in continuing to invest in company stock.

To the extent Brown's complaint might be interpreted as asserting inaction by the defendants, or actions other than sending the Dear Doctor letter, as circumstances that made Medtronic stock an imprudent investment, his arguments are without merit. Brown's counsel explained at oral argument to our court that the proper course of action, in his view, would have been for the plan to immediately divest itself of all company stock upon receipt of Dr. Hauser's report. It is undisputed, however, that the plan held more than $1 billion in company stock, and it is fanciful to believe Medtronic could have taken such an action without creating a much more severe impact on stock price than the alleged impact that Medtronic's actual response caused. While we recognize that we must accept as true a plaintiff's factual allegations for the purpose of analyzing a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff is the master of his own complaint, and we are not required, even at this preliminary stage, to draw unreasonable inferences from documents the plaintiff makes a part of the complaint. We also are not required to accept as plausible wholly unrealistic assertions regarding what the company or plan committee in this case should have done upon receipt of Dr. Hauser's report. Here, Brown has simply alleged insufficient specific facts to establish a plausible imprudent investment claim.

For the same reasons, Brown's misrepresentation claim, Claim 2, fails. Finally, Brown's derivative claims, Claims 3 and 5, also fail. These derivative claims allege a breach of the duty of loyalty and a breach of the duty to properly appoint, monitor

and inform the plan committee, respectively. We hold that neither of these claims can survive without a sufficiently pled theory of an underlying breach. See, e.g., Ward v. Avaya, Inc., 487 F. Supp. 2d 467, 481 (D.N.J. 2007) ("Plaintiff's complaint has failed to state a claim for breach of fiduciary duty . . . as to any of the Plans' fiduciaries. Consequently, Plaintiff's claims for failing to adequately monitor these fiduciaries must also fail.").

For the foregoing reasons, we affirm the judgment of the district court.

_____